(26) "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended from time to time.

(27) "Closing" has the meaning set forth in Section 3.1.

(28) "Closing Date" has the meaning set forth in Section 3.1.

(29) "Closing Nuclear Fuel Supply Amount" has the meaning set forth in Section 3.3(a).

(30) "Closing Payment" has the meaning set forth in Section 3.2(c).

(31) "Closing Statement" has the meaning set forth in Section 3.3(a).

(32) "Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations promulgated thereunder from time to time.

(33) "Collateral Agreement" means the purchase agreement dated as of the date hereof between ACE and Buyer, relating to the sale by ACE to Buyer of certain properties and assets at the Salem Station.

(34) "Commercial Arbitration Rules" has the meaning set forth in Section 8.3(c).

(35) "Commercially Reasonable Efforts" means efforts by a Party which are designed to enable a Party, directly or indirectly, to satisfy a condition to, or otherwise assist in the consummation of, the transactions contemplated by this Agreement and which do not require the performing Party to expend funds or assume liabilities other than expenditures and liabilities which are customary and reasonable in nature and amount in the context of the transactions contemplated by this Agreement.

(36) "Confidentiality Agreement" means the Confidentiality Agreement, dated August 6, 1999, as amended, between Conectiv and PSEG Energy Holdings, an Affiliate of Buyer.

(37) "Courts" has the meaning set forth in Section 10.10.

(38) "CSFB" has the meaning set forth in Section 10.3.

(39) "Decommissioning" means to remove the Salem Station from service and restore the Sites, in accordance with applicable Law, including (a) the dismantlement, decontamination, storage or entombment of the Salem Station, in whole or in part, and any reduction or removal, whether before or after termination of the NRC Licenses for the Salem Station, of radioactivity at the Sites relating to the Salem Station and (b) all activities necessary for the retirement, dismantlement and decontamination of the Salem Station to comply with all Laws, including Nuclear Laws and Environmental Laws, including the requirements of the Atomic Energy Act and the NRC's rules, regulations, orders and pronouncements thereunder, the NRC Licenses for the Salem Station and related decommissioning plans.

(40) "Decommissioning Costs" means the costs of Decommissioning the Salem Station in accordance with all applicable Laws, including Nuclear Laws and Environmental Laws.

(41) "Decommissioning Funds" means, collectively, the Seller's Qualified Decommissioning Funds and the Seller's Nonqualified Decommissioning Funds.

(42) "Deeds" means the special warranty deeds, as customarily used in the State of New Jersey in form and substance reasonably satisfactory to the Parties, pursuant to which Seller will convey all of its rights, title and interests in the Real Property to Buyer.

(43) "Defined Expenses" has the meaning set forth in Section 6.1(b).

(44) "Department of Energy" means the United States Department of Energy, and any successor agency thereto.

(45) "Department of Energy Decommissioning and Decontamination Fees" means all fees related to the Department of Energy's special assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Fund pursuant to Sections 1801, 1802 and 1803 of the Atomic Energy Act (42 U.S.C. 2297g *et seq.*), and the Department of Energy's implementing regulations at 10 CFR Part 766, and any similar fees assessed under amended or superseding statutes or regulations applicable to separative work units purchased from the Department of Energy in order to decontaminate and decommission the Department of Energy's gaseous diffusion enrichment facilities.

(46) "Department of Energy Standard Contract" means the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, No. DE-CR01-83NE44480 with respect to the Salem Station, dated as of June 13, 1983 between the United States of America, represented by the United States Department of Energy, and PSE&G Utility.

(47) "Direct Claim" has the meaning set forth in Section 8.2(d).

(48) "Encumbrances" means any and all mortgages, pledges, liens, claims, security interests, conditional and installment sale agreements, easements, activity and use limitations, exceptions, rights-of-way, deed restrictions, defects of title, encumbrances and charges of any kind.

(49) "Environmental Claims" has the meaning set forth in Section 8.1(c).

(50) "Environmental Condition" means the presence or Release to the environment, whether at the Sites or otherwise, of Hazardous Substances, including any migration of Hazardous Substances through air, soil or groundwater at, to or from the Sites or at, to or from any Off-Site Location, regardless of when such presence or Release occurred or is discovered.

(51) "Environmental Laws" means all (a) Laws, in each case, as amended from time to time, relating to pollution or protection of the environment, natural resources or human health and safety, including Laws relating to Releases or threatened Releases of Hazardous Substances or otherwise relating to the manufacture, formulation, generation, processing, distribution, use, treatment, storage, Release, transport, Remediation, abatement, cleanup or handling of Hazardous Substances, (b) Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances and (c) Laws relating to the management or use of natural resources; but shall not include Nuclear Laws.

(52) "Environmental Permits" means all permits, registrations, certifications, franchises, certificates, licenses and other authorizations, consents and approvals of any Governmental Authorities with respect to or under Environmental Laws.

(53) "Estimated Nuclear Fuel Supply Amount" has the meaning set forth in Section 3.2(b).

(54) "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

(55) "Excluded Assets" has the meaning set forth in Section 2.2.

(56) "Excluded Liabilities" has the meaning set forth in Section 2.4.

(57) "FERC" means the United States Federal Energy Regulatory Commission, and any successor agency thereto.

(58) "Final Allocation" has the meaning set forth in Section 3.4.

(59) "FIRPTA Affidavit" means the Foreign Investment in Real Property Tax Act Certification and Affidavit of Seller, to be delivered at the Closing, substantially in the form of Exhibit C hereto.

(60) "Fuel Supplies" means, collectively, the Nuclear Fuel Supplies, and fuel oil supplies, in each case, for use at the Salem Station.

(61) "Fund Tax Loss" has the meaning set forth in Section 6.5(g).

(62) "Governmental Authority" means any foreign, federal, state, local or other governmental, executive, legislative, judicial, regulatory or administrative agency, court, commission, department, board, or other governmental subdivision, legislature, tribunal, government-owned corporation or other governmental authority.

(63) "Hazardous Substances" means (a) any petrochemical or petroleum products, oil or coal ash, radioactive materials, radon gas, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid which may contain polychlorinated biphenyls, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants" or words of similar meaning and regulatory effect under any Environmental Law and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any Environmental Law; but shall not include Nuclear Material to the extent regulated under Nuclear Laws.

(64) "<u>High-Level Waste</u>" means (a) irradiated nuclear reactor fuel, (b) liquid wastes resulting from the operation of the first cycle solvent extraction system, or its equivalent, and the concentrated wastes from subsequent extraction cycles, or their equivalent, in a facility for reprocessing irradiated reactor fuel and (c) solids into which such liquid wastes have been converted.

(65) "<u>High-Level Waste Repository</u>" means a facility subject to the licensing and regulatory authority of the NRC, and which is designed, constructed and operated by or on behalf of the Department of Energy for the storage and disposal of Spent Nuclear Fuel and other High-Level Waste in accordance with the requirements set forth in the Nuclear Waste Policy Act.

(66) "<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

(67) "<u>Income Tax</u>" means any Tax imposed by any Governmental Authority (a) based upon, measured by or calculated with respect to gross or net income, profits or receipts (including municipal gross receipt Taxes, capital gains Taxes and minimum Taxes) or (b) based upon, measured by or calculated with respect to multiple bases (including corporate franchise taxes) if one or more of such bases is described in clause (a), in each case together with any interest, penalties or additions attributable to such Tax.

(68) "<u>Indemnifiable Loss</u>" has the meaning set forth in Section 8.1(a).

(69) "<u>Indemnifying Party</u>" has the meaning set forth in Section 8.1(f).

(70) "<u>Indemnitee</u>" has the meaning set forth in Section 8.1(b).

(71) "<u>Independent Accounting Firm</u>" means such nationally recognized, independent accounting firm as is mutually appointed by Seller and Buyer for purposes of this Agreement.

(72) "<u>Inspection</u> " means all tests, reviews, examinations, inspections, investigations, verifications, samplings and similar activities conducted by Buyer or its Representatives with respect to the Purchased Assets prior to the Closing.

(73) "<u>Inventories</u>" means materials, spare parts, capital spare parts, consumable supplies and chemical inventories relating to the operation of the Salem Station; but shall not include Fuel Supplies.

(74) "ISRA" has the meaning set forth in Section 6.7(a)(i).

(75) "Knowledge" means the actual knowledge of the directors and executive officers of the specified Person, which directors and executive officers are charged with responsibility for the particular function after reasonable inquiry by them of selected employees of such Persons whom they believe, in good faith, to be the persons responsible for the subject matter of the inquiry, as of the date of this Agreement, or, with respect to any certificate delivered pursuant to this Agreement, the date of delivery of such certificate.

(76) "LDV Agreement" means the Integration of Lower Delaware Valley Transmission System Agreement, Amendments and Supplements between Seller, ACE, Jersey Central Power & Light Company, PECO and PSE&G Utility, as amended and revised from time to time.

(77) "Laws" means all laws, statutes, rules, regulations and ordinances of any Governmental Authority.

(78) "Low-Level Waste" means radioactive material that (a) is not High-Level Waste, Spent Nuclear Fuel or Byproduct Material, and (b) the NRC classifies as low-level radioactive waste.

(79) "Material Adverse Effect" means any change in or effect on the Salem Station or any portion thereof (other than the Decommissioning Funds) that is materially adverse to the operation or condition (financial or otherwise) of the Salem Station, taken as a whole, including a shutdown thereof that is materially adverse to the operation or condition (financial or otherwise) of the Salem Station, but excluding (a) any change or effect generally affecting the international, national, regional or local electric industry as a whole and not specific to the Salem Station (other than any change or effect affecting the nuclear electric industry generally), (b) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electricity, including any change in or effect on the structure, operating agreements, operations or procedures of Pennsylvania-New Jersey-Maryland Interconnection L.L.C. or its control area, (c) any change or effect resulting from changes in the international, national, regional or local markets for any fuel (whether nuclear or otherwise) used at the Salem Station, (d) any change or effect resulting from changes in the North American, national, regional or local electricity transmission systems or operations thereof, (e) any change or effect to the extent constituting or involving an Excluded Asset or an Excluded Liability and (f)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE

any change or effect which is cured (including by payment of money) before the earlier of the Closing and the termination of this Agreement pursuant to Section 9.1.

(80) "Mortgage" means the Mortgage and Deed of Trust, dated as of October 1, 1934, between Seller and New York Trust Co., as amended.

(81) "NEIL" means Nuclear Electric Insurance Limited, and any successor entity thereto.

(82) "Net Book Value" means, as of any date and with respect to any asset or property, an amount equal to the original cost of such asset or property less applicable depreciation and amortization, calculated and presented in accordance with methods and procedures historically applied by Buyer in the preparation of monthly statements delivered to Seller under the Owners Agreement prior to the date hereof.

(83) "NJBPU" means the New Jersey Board of Public Utilities, and any successor agency thereto.

(84) "NJDEP" means the New Jersey Department of Environmental Protection, and any successor agency thereto.

(85) "NRC" means the Nuclear Regulatory Commission, as established by § 201 of the Energy Reorganization Act of 1974, 42 U.S.C. § 5841, as amended, and any successor agency thereto.

(86) "NRC Applications" means whatever actions may be necessary or appropriate to request and obtain the NRC Approvals.

(87) "NRC Approvals" means the consent of the NRC pursuant to Section 184 of the Atomic Energy Act and 10 C.F.R. § 50.80 to the transfer of the Purchased Assets to Buyer, NRC approval of all conforming administrative license amendments associated with such transfers, NRC consent to the transfer of, and approval of any related amendments to, any nuclear materials licenses associated with such transfers and any other NRC consents and approvals required in connection with the consummation of the transactions contemplated by this Agreement.

(88) "NRC Licenses" means, together, (i) Facility Operating License No. DPR-70 with respect to Unit 1 at the Salem Station and (ii) Facility Operating

License No. DPR-75 with respect to Unit 2 at the Salem Station, in each case, issued by the NRC to Seller, ACE, PSE&G Utility and PECO, as amended.

(89) "Nuclear Fuel Supplies" means the nuclear fuel assemblies in the reactor core, natural uranium, converted uranium, enriched uranium and any other form of any thereof, under contract or in inventory, and located at or in transit to the Salem Station, as well as all nuclear fuel constituents in all stages of the fuel cycle which are in the process of production, conversion, enrichment or fabrication.

(90) "Nuclear Laws" means, collectively, in each case, as amended from time to time, (a) all Laws relating to: the regulation of nuclear power plants, Nuclear Materials and the transportation and storage of Nuclear Materials; the regulation of nuclear fuel; the enrichment of uranium; the disposal and storage of High-Level Waste, and Spent Nuclear Fuel, and contracts for and payments into the Nuclear Waste Fund; (b) the Atomic Energy Act of 1954 (42 U.S.C. § 2011 *et seq.*); (c) the Energy Reorganization Act of 1974 (42 U.S.C. § 5801 *et seq.*); (d) the Convention on the Physical Protection of Nuclear Material Implementation Act of 1982 (Public Law 97 - 351; 96 STAT. 1663); (e) the Foreign Assistance Act of 1961 (22 U.S.C. § 2429 *et seq.*); (f) the Nuclear Non-Proliferation Act of 1978 (22 U.S.C. § 3201); (g) the Low-Level Radioactive Waste Policy Act (42 U.S.C. § 2021b *et seq.*); (h) the Nuclear Waste Policy Act; (i) the Low-Level Radioactive Waste Policy Amendments Act of 1985 (42 U.S.C. § 2021d, 471); (j) the Energy Policy Act of 1992 (42 U.S.C. § 13201 *et seq.*); (k) New Jersey Radiation Protection Act, N.J.S.A. 26: 2D-1 *et seq.*; and (l) New Jersey Radiation Accident Response Act, N.J.S.A. 26: 2D-37 *et.seq.*; but shall not include Environmental Laws.

(91) "Nuclear Materials" means Source Material, Special Nuclear Material, Low-Level Waste, High-Level Waste, Byproduct Material and Spent Nuclear Fuel.

(92) "Nuclear Waste Fund" means the fund established by the Department of Energy under the Nuclear Waste Policy Act in which the Spent Nuclear Fuel Fees to be used for the design, construction and operation of a High-Level Waste Repository and other activities related to the storage and disposal of Spent Nuclear Fuel or High-Level Waste are deposited.

(93) "Nuclear Waste Policy Act" means the Nuclear Waste Policy Act of 1982, as amended from time to time (42 U.S.C. § 10101 *et seq.*).

(94) "Off-Site Location" means any real property other than the Sites.

(95) "Owners Agreement" means the Owners Agreement for Salem Nuclear Generating Station Units No. 1, 2 and 3, dated as of November 24, 1971, as amended, by and between Seller, ACE, PECO and PSE&G Utility.

(96) "Party" and "Parties" have the respective meanings set forth in the preamble to this Agreement.

(97) "PECO" means PECO Energy Company (formerly Philadelphia Electric Company), a Pennsylvania corporation.

(98) "Permitted Encumbrances" means: (a) such Encumbrances as arise under any Seller's Agreement or the LDV Agreement; (b) with respect to any period before the Closing, Encumbrances created by the Mortgage; (c) statutory liens for Taxes or other charges or assessments of Governmental Authorities not yet due or delinquent or the validity of which is being challenged in good faith by appropriate proceedings provided that the aggregate amount being so contested does not exceed $100,000 or Seller has provided Buyer adequate security with respect thereto, in form and substance satisfactory to Buyer; (d) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of Buyer; (e) such zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities as (i) do not materially detract from the value of any Purchased Asset as currently used, or materially interfere with the present use of any Purchased Asset or (ii) would not, individually or in the aggregate, have a Material Adverse Effect; and (f) such non-monetary easements, activity and use limitations, exceptions, rights of way, deed restrictions, covenants and conditions and defects of title as (i) do not materially detract from the value of the Real Property as currently used or materially interfere with the present use of the Real Property or (ii) would not, individually or in the aggregate, have a Material Adverse Effect.

(99) "Person" means any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, other business association or Governmental Authority.

(100) "Prime Rate" has the meaning set forth in Section 3.3(c).

(101) "PSE&G Utility" means Public Service Electric & Gas Company, a New Jersey corporation.

(102) "PUHCA" means the Public Utility Holding Company Act of 1935, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

(103) "Purchase Price" has the meaning set forth in Section 3.2(a).

(104) "Purchased Assets" has the meaning set forth in Section 2.1.

(105) "Real Property" means all real property interests in the Counties of Salem, Cumberland and Cape May, New Jersey owned by the Seller (including all land and the buildings and other improvements thereon and all appurtenances thereto) on, underlying or used in connection with the Salem Station and the properties acquired under the estuary enhancement program related thereto, including the properties set forth on Schedule 1.1(105).

(106) "Regulatory Termination" has the meaning set forth in Section 9.3.

(107) "Release" means any release, spill, leak, discharge, disposal of, pumping, pouring, emitting, emptying, injecting, leaching, dumping, depositing, dispersing, allowing to escape or migrate into or through the environment (including ambient air, surface water, groundwater, land surface and subsurface strata) or within any building, structure, facility or fixture.

(108) "Remediation" or "Remediate" means action of any kind to address an Environmental Condition or a Release or threatened Release of Hazardous Substances or the presence of Hazardous Substances at the Sites or an Off-Site Location, including the following activities to the extent they relate to, result from or arise out of the presence of a Hazardous Substance at the Sites or an Off-Site Location: (a) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, response or restoration work; (b) obtaining any permits, consents, approvals or authorizations of any Governmental Authority necessary to conduct any such activity; (c) preparing and implementing any plans or studies for any such activity; (d) obtaining a written notice from a Governmental Authority with jurisdiction over the Sites or an Off-Site Location under Environmental Laws that no material additional work is required by such Governmental Authority; (e) the use, implementation, application, installation, operation or maintenance of removal actions on the Sites or an Off-Site Location, remedial technologies applied to the surface or subsurface soils, excavation and treatment or disposal of soils at an Off-Site Location, systems for long-term treatment of surface water or groundwater, engineering controls or institutional controls; and (f) any other activities reasonably

determined by a Party to be necessary or appropriate or required under Environmental Laws to address an Environmental Condition or a Release of Hazardous Substances or the presence of Hazardous Substances at the Sites or an Off-Site Location.

(109) "Representatives" of a Person means, collectively, such Person's Affiliates and its and their respective directors, officers, partners, members, employees, representatives, agents, advisors (including accountants, legal counsel, environmental consultants and financial advisors), parent entities and other controlling Persons.

(110) "Salem Interest" means Seller's undivided 7.41% interest as tenant in common without the right of partition in the Salem Station.

(111) "Salem Station" means the generating station described in the Owners Agreement described in Section 1.1(95).

(112) "Salem Station Budget" has the meaning set forth in Section 6.1(b).

(113) "SEC" means the United States Securities and Exchange Commission, and any successor agency thereto.

(114) "Securities Act" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

(115) "Seller" has the meaning set forth in the preamble to this Agreement.

(116) "Seller Nuclear Permits" has the meaning set forth in Section 4.7.

(117) "Seller Permits" has the meaning set forth in Section 4.4.

(118) "Seller Tax Loss" has the meaning set forth in Section 6.5(g).

(119) "Seller's Agreements" means, collectively, the contracts, agreements, arrangements, licenses and leases of any nature, which shall be assigned pursuant to Section 2.1(f), (i) to which Seller is a party, each of which is set forth in Schedule 1.1(119), and (ii) entered into by Buyer, for and on behalf of Seller, whether under the Owners Agreement or otherwise, and by or to which Seller or the Purchased Assets is or are bound or subject, in each case, relating to the ownership, lease, maintenance or operation of the Purchased Assets.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE

(120) "Seller's Indemnitee" has the meaning set forth in Section 8.1(a).

(121) "Seller's Insurance Policies" means all insurance policies with respect to the ownership, lease, maintenance or operation of the Purchased Assets, including all liability, property damage and business interruption policies in respect thereof, for which solely Seller or its Affiliates (as opposed to Buyer or its Affiliates) are liable for the payment of premiums and related charges.

(122) "Seller's Nonqualified Decommissioning Funds" means the trust funds that are designated as nonqualified decommissioning funds for the Salem Station and held pursuant to the Trust Agreement.

(123) "Seller's Qualified Decommissioning Funds" means the trust funds that are designated as "nuclear decommissioning reserve funds" under Code Section 468A for the Salem Station and held pursuant to the Trust Agreement.

(124) "Seller's Required Regulatory Approvals" has the meaning set forth in Section 4.3(b).

(125) "Sites" means the Real Property forming a part, or used or usable in connection with the operation, of the Salem Station, including any real property used for the disposal of solid or hazardous waste that is included in the Real Property. Any reference to the Sites shall include the surface and subsurface elements, to the extent owned by Seller, including the soil and groundwater present at the Sites, and any reference to materials or conditions "at the Sites", including Hazardous Substances and Environmental Conditions, shall include all materials and conditions "at, on, in, upon, over, across, under or within" the Sites.

(126) "Source Material" means: (a) uranium or thorium, or any combination thereof, in any physical or chemical form or (b) ores which contain by weight one-twentieth of one percent (0.05%) or more of (i) uranium, (ii) thorium or (iii) any combination thereof; but shall not include Special Nuclear Material.

(127) "Special Nuclear Material" means plutonium, uranium-233, uranium enriched in the isotope-233 or in the isotope-235, and any other material that the NRC determines to be "Special Nuclear Material", and any material artificially enriched by any of the foregoing materials or isotopes; but shall not include Source Material.

(128) "Spent Nuclear Fuel" means nuclear fuel that has been withdrawn from a nuclear reactor following irradiation and has not been chemically separated into its constituent elements by reprocessing, including the Special Nuclear Material. Byproduct Material, Source Material and other radioactive materials associated with nuclear fuel assemblies.

(129) "Spent Nuclear Fuel Fees" means the fees assessed on electricity generated and sold at the Salem Station pursuant to the Department of Energy Standard Contract, as provided in Section 302 of the Nuclear Waste Policy Act and 10 C.F.R. Part 961, as amended from time to time.

(130) "Subsequent Transaction" has the meaning set forth in Section 9.3.

(131) "Subsidiary", when used in reference to any Person, means any entity of which outstanding securities or interests having ordinary voting power to elect a majority of the board of directors or other governing body performing similar functions of such entity are owned directly or indirectly by such Person.

(132) "Tangible Personal Property" has the meaning set forth in Section 2.1(e).

(133) "Tax" or "Taxes" means all taxes, surtaxes, charges, fees, levies, penalties and other assessments imposed by any Governmental Authority, including income, gross receipts, excise, property, sales, transfer, use, franchise, special franchise, payroll, recording, withholding, social security, gross receipts, license, stamp, occupation, employment or other taxes, including any interest, penalties or additions attributable thereto or any liability for taxes incurred by reason of joining in the filing of any consolidated, combined or unitary Tax Returns, in each case including any interest, penalties or additions attributable thereto; provided, however, that "Taxes" shall not include sewer rents or charges for water.

(134) "Tax Benefit" has the meaning set forth in Section 8.1(d).

(135) "Tax Cost" has the meaning set forth in Section 8.1(d).

(136) "Tax Return" means any return, report, information return, declaration, claim for refund, or other document, together with all amendments and supplements thereto (including all related or supporting information), required to be supplied to any Governmental Authority responsible for the administration of Laws governing Taxes.

(137) "Termination Date" has the meaning set forth in Section 9.1(b).

(138) "Third-Party Claim" has the meaning set forth in Section 8.2(a).

(139) "Transferable Permits" means all those Seller Permits, including Seller's Nuclear Permits (and all applications pertaining thereto), which are transferable under applicable Laws by Seller to Buyer with or without a filing with, notice to, consent or approval of any Governmental Authority.

(140) "Transfer Taxes" means any property transfer or gains tax, sales tax, conveyance fee, use tax, stamp tax, stock transfer tax or other similar tax, including any related penalties, interest and additions to tax.

(141) "Transmission Assets" has the meaning set forth in Section 2.2(a).

(142) "Trust Agreement" means the Nuclear Decommissioning Master Trust Agreement between Delmarva Power & Light Company and Mellon Bank, N.A., dated December 1, 1995.

(143) "USEPA" means the United States Environmental Protection Agency, and any successor agency thereto.

1.2 Certain Interpretive Matters. The Article, Section and Schedule headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning of this Agreement. The term "includes" or "including" shall mean "including without limitation." The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Other capitalized terms used in this Agreement and not defined in Section 1.1 shall have the meanings assigned to them elsewhere in this Agreement. Unless the context otherwise requires, the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument, statute, regulation, rule or order defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument, statute, regulation, rule or order as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes, regulations, rules or orders) by succession of comparable successor statutes, regulations, rules or orders and

references to all attachments thereto and instruments incorporated therein. References to a Section, Article, Exhibit or Schedule shall mean a Section, Article, Exhibit or Schedule of this Agreement.

1.3 U.S. Dollars. When used herein, the term "dollars" and the symbol "$" refer to the lawful currency of the United States of America.

1.4 Seller's Interest in Purchased Assets The Parties acknowledge and agree that Seller owns and holds an undivided seven and forty-one hundredths percent (7.41%) interest as tenant in common without the right of partition in the Salem Station. The Parties agree that all references in this Agreement to Seller's rights, title and interests in, to and under the Purchased Assets, and rights, liabilities and obligations in connection therewith, shall be construed in this context.

## ARTICLE II

## PURCHASE AND SALE

2.1 Transfer of Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase, assume and acquire from Seller, free and clear of all Encumbrances, except for the Permitted Encumbrances, all of Seller's rights, title and interests, of whatever kind and nature, whether tangible or intangible, in and to all assets (except for the Excluded Assets) constituting or used and necessary for the operation of the Salem Station or any portion thereof, together with all goodwill relating thereto, including, without limitation, those assets listed below, each as in existence on the Closing Date (collectively, the "Purchased Assets"):

(a) The Real Property;

(b) The Inventories;

(c) The Nuclear Materials held pursuant to the NRC Licenses;

(d) The Fuel Supplies;

(e) All machinery (mobile or otherwise), equipment (including computer hardware and software and communications equipment), vehicles, tools,

spare parts, fixtures, furniture, furnishings and other personal property located at or in transit to the Salem Station or used and necessary for the operation of the Salem Station, in each case, on the Closing Date (collectively, the "Tangible Personal Property"), including the electrical transmission assets (as opposed to generation assets) set forth in Schedule 2.1(e);

(f) Subject to the receipt of necessary consents and approvals, the Seller's Agreements;

(g) Subject to the receipt of necessary consents and approvals, the Transferable Permits and all of Seller's rights, title and interests in and to any other permits, registrations, franchises, certificates, licenses and other authorizations, consents and approvals of Governmental Authorities relating to the ownership, lease, maintenance or operation of the Salem Station or any portion thereof;

(h) Seller's Nonqualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(i) Seller's Qualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(j) All books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of Seller relating specifically to the Salem Station (subject to the right of Seller to retain copies of same for its use) other than such items which are proprietary to third parties and accounting records;

(k) All unexpired, transferable warranties and guarantees from third parties arising out of, in respect of, or in connection with, (i) any item of Real Property or personal property, or interest therein, included in the Purchased Assets or (ii) the Assumed Liabilities;

(l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy

with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(l); and

(m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date, other than the claims described in Section 2.2(m).

2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall constitute or be construed as requiring Seller to sell, assign, convey, transfer or deliver, and Buyer shall not be entitled to purchase or acquire, any right, title or interest in, to or under the following assets and properties which are associated with the Purchased Assets, but which are hereby specifically excluded from the definition of Purchased Assets (collectively, the "Excluded Assets"):

(a) The right, title and interest of Seller in, to and under all electrical transmission or distribution assets (as opposed to generation assets) located at or forming part of the Salem Station (whether or not regarded as a "transmission" or "generation" asset for regulatory or accounting purposes), including all switchyard facilities, substation facilities and support equipment, as well as all permits, contracts (including the LDV Agreement) and warranties, to the extent they relate to such transmission and distribution assets (other than the electrical transmission assets identified in Schedule 2.1(e) included as Purchased Assets) (collectively, the "Transmission Assets");

(b) The right, title and interest of Seller in, to and under certain switches and meters, gas facilities, revenue meters and remote testing units, drainage pipes and systems, pumping equipment and associated piping, in each case, located at or forming part of the Salem Station as identified in Schedule 2.2(b) attached hereto;

(c) All certificates of deposit, shares of stock, securities, bonds, debentures, evidences of indebtedness, and interests in joint ventures, partnerships, limited liability companies and other entities, including account balances under Seller's Insurance Policies and the right, title and interest of Seller in, to and under

(k) All other assets and properties owned or leased by Seller which are not used and necessary for the operation of the Salem Station or any portion thereof;

(l) All claims of Seller relating to or pertaining to any refund or credit received on or after the Closing Date by Buyer or its successors or permitted assigns of all or any part of Department of Energy Decommissioning and Decontamination Fees for which Seller is or was liable; provided that Seller shall not have any right to pursue such claims separately, but shall be entitled to pursue such claims solely by joint action with Buyer and any other interested parties approved by Buyer, such action to be controlled by Buyer in its sole discretion; provided, also, that if Buyer shall receive any such refund or credit on or after the Closing Date of all or any part of such Department of Energy Decommissioning and Decontamination Fees, Seller's claim to a portion of such refund shall be limited to the amount of such refund or credit multiplied by a fraction, (i) the numerator of which is the amount of Decommissioning and Decontamination Fees with respect to the Salem Station paid by Seller or on Seller's behalf, and (ii) the denominator of which is the amount of Decommissioning and Decontamination Fees with respect to the Salem Station paid by all of the parties to the Owners Agreement or on their behalf; and provided, further, that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims (but not Department of Energy Decommissioning and Decontamination Fees), such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyer;

(m) All rights of Seller in, to and under the action against Westinghouse Electric Corporation or its Affiliates, or their respective successors or assigns, captioned Public Service Electric & Gas Company, et al. v. Westinghouse Electric Corporation, C.A. No. 96-925 (MTB) in the United States District Court for the District of New Jersey, and all related actions currently pending in state courts; provided that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims, such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyer; and

(ACE-SALEM)
Conformed

# PURCHASE AGREEMENT

BY AND BETWEEN

ATLANTIC CITY ELECTRIC COMPANY

and

PSEG POWER LLC

Dated as of September 27, 1999

178025.10-WilmingtonS1A

(e) All machinery (mobile or otherwise), equipment (including computer hardware and software and communications equipment), vehicles, tools, spare parts, fixtures, furniture, furnishings and other personal property located at or in transit to the Salem Station or used and necessary for the operation of the Salem Station, in each case, on the Closing Date (collectively, the "Tangible Personal Property"), including the electrical transmission assets (as opposed to generation assets) set forth in Schedule 2.1(e);

(f) Subject to the receipt of necessary consents and approvals, the Seller's Agreements;

(g) Subject to the receipt of necessary consents and approvals, the Transferable Permits and all of Seller's rights, title and interests in and to any other permits, registrations, franchises, certificates, licenses and other authorizations, consents and approvals of Governmental Authorities relating to the ownership, lease, maintenance or operation of the Salem Station or any portion thereof;

(h) Seller's Nonqualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(i) Seller's Qualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(j) All books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of Seller relating specifically to the Salem Station (subject to the right of Seller to retain copies of same for its use) other than such items which are proprietary to third parties and accounting records;

(k) All unexpired, transferable warranties and guarantees from third parties arising out of, in respect of, or in connection with, (i) any item of Real Property or personal property, or interest therein, included in the Purchased Assets or (ii) the Assumed Liabilities;

(l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after

the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(l); and

(m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date, other than the claims described in Section 2.2(m).

2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall constitute or be construed as requiring Seller to sell, assign, convey, transfer or deliver, and Buyer shall not be entitled to purchase or acquire, any right, title or interest in, to or under the following assets and properties which are associated with the Purchased Assets, but which are hereby specifically excluded from the definition of Purchased Assets (collectively, the "Excluded Assets"):

(a) The right, title and interest of Seller in, to and under all electrical transmission or distribution assets (as opposed to generation assets) located at or forming part of the Salem Station (whether or not regarded as a "transmission" or "generation" asset for regulatory or accounting purposes), including all switchyard facilities, substation facilities and support equipment, as well as all permits, contracts (including the LDV Agreement) and warranties, to the extent they relate to such transmission and distribution assets (other than the electrical transmission assets identified in Schedule 2.1(e) included as Purchased Assets) (collectively, the "Transmission Assets");

(b) The right, title and interest of Seller in, to and under certain switches and meters, gas facilities, revenue meters and remote testing units, drainage pipes and systems, pumping equipment and associated piping, in each case, located at or forming part of the Salem Station as identified in Schedule 2.2(b) attached hereto;

(c) All certificates of deposit, shares of stock, securities, bonds, debentures, evidences of indebtedness, and interests in joint ventures, partnerships, limited liability companies and other entities, including account balances under

(j) The right, title and interest of Seller in, to and under all contracts, agreements, arrangements, licenses and leases of any nature, other than the Seller's Agreements;

(k) All other assets and properties owned or leased by Seller which are not used and necessary for the operation of the Salem Station or any portion thereof;

(l) All claims of Seller relating to or pertaining to any refund or credit received on or after the Closing Date by Buyer or its successors or permitted assigns of all or any part of Department of Energy Decommissioning and Decontamination Fees for which Seller is or was liable; provided that Seller shall not have any right to pursue such claims separately, but shall be entitled to pursue such claims solely by joint action with Buyer and any other interested parties approved by Buyer, such action to be controlled by Buyer in its sole discretion; provided, also, that if Buyer shall receive any such refund or credit on or after the Closing Date of all or any part of such Department of Energy Decommissioning and Decontamination Fees, Seller's claim to a portion of such refund shall be limited to the amount of such refund or credit multiplied by a fraction, (i) the numerator of which is the amount of Decommissioning and Decontamination Fees with respect to the Salem Station paid by Seller or on Seller's behalf, and (ii) the denominator of which is the amount of Decommissioning and Decontamination Fees with respect to the Salem Station paid by all of the parties to the Owners Agreement or on their behalf; and provided, further, that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims (but not Department of Energy Decommissioning and Decontamination Fees), such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyer;

(m) All rights of Seller in, to and under the action against Westinghouse Electric Corporation or its Affiliates, or their respective successors or assigns, captioned Public Service Electric & Gas Company, et al. v. Westinghouse Electric Corporation, C.A. No. 96-925 (MTB) in the United States District Court for the District of New Jersey, and all related actions currently pending in state courts; provided that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims, such proportionate share to be determined as if

(HOPE CREEK)
Conformed

# PURCHASE AGREEMENT

BY AND BETWEEN

ATLANTIC CITY ELECTRIC COMPANY

and

PSEG POWER LLC

Dated as of September 27, 1999

179450.03-WilmingtonS1A

in transit to the Hope Creek Station or used and necessary for the operation of the Hope Creek Station, in each case, on the Closing Date (collectively, the "Tangible Personal Property"), including the electrical transmission assets (as opposed to generation assets) set forth in Schedule 2.1(e);

(f) Subject to the receipt of necessary consents and approvals, the Seller's Agreements;

(g) Subject to the receipt of necessary consents and approvals, the Transferable Permits and all of Seller's rights, title and interests in and to any other permits, registrations, franchises, certificates, licenses and other authorizations, consents and approvals of Governmental Authorities relating to the ownership, lease, maintenance or operation of the Hope Creek Station or any portion thereof;

(h) Seller's Nonqualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(i) Seller's Qualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(j) All books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of Seller relating specifically to the Hope Creek Station (subject to the right of Seller to retain copies of same for its use) other than such items which are proprietary to third parties and accounting records;

(k) All unexpired, transferable warranties and guarantees from third parties arising out of, in respect of, or in connection with, (i) any item of Real Property or personal property, or interest therein, included in the Purchased Assets or (ii) the Assumed Liabilities;

(l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(l); and

(k) All other assets and properties owned or leased by Seller which are not used and necessary for the operation of the Hope Creek Station or any portion thereof;

(l) All claims of Seller relating to or pertaining to any refund or credit received on or after the Closing Date by Buyer or its successors or permitted assigns of all or any part of Department of Energy Decommissioning and Decontamination Fees for which Seller is or was liable; provided that Seller shall not have any right to pursue such claims separately, but shall be entitled to pursue such claims solely by joint action with Buyer and any other interested parties approved by Buyer, such action to be controlled by Buyer in its sole discretion; provided, also, that if Buyer shall receive any such refund or credit on or after the Closing Date of all or any part of such Department of Energy Decommissioning and Decontamination Fees, Seller's claim to a portion of such refund shall be limited to the amount of such refund or credit multiplied by a fraction, (i) the numerator of which is the amount of Decommissioning and Decontamination Fees with respect to the Hope Creek Station paid by Seller or on Seller's behalf, and (ii) the denominator of which is the amount of Decommissioning and Decontamination Fees with respect to the Hope Creek Station paid by all of the parties to the Owners Agreement or on their behalf; and provided, further, that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims (but not Department of Energy Decommissioning and Decontamination Fees), such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyer; and

(m) The right, title and interest of Seller in, to and under this Agreement and the Additional Agreements.

2.3 Assumed Liabilities. At the Closing, Buyer shall assume and agree to pay, perform and otherwise discharge, without recourse to Seller (other than as set forth herein or in the Owners Agreement, as amended by the Amendment to Owners Agreement), in accordance with the terms and subject to the conditions set forth herein, all of the liabilities and obligations of Seller, direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, which relate to the Purchased Assets (other than Excluded Liabilities) (the "Assumed Liabilities"), including those set forth below; provided that nothing set forth in this Section 2.3 shall require Buyer to assume any liabilities or obligations that are expressly excluded pursuant to Section 2.4:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DELMARVA POWER AND LIGHT CO., )
)
Plaintiff, )
)
v. ) Docket No. 04-34C
)
UNITED STATES, )
)
Defendant. )

Room 505
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Thursday,
April 7, 2005

The parties met, pursuant to notice of the Court, at 3:00 p.m.

BEFORE: HONORABLE CHRISTINE O. C. MILLER
Judge

APPEARANCES:

For the Plaintiff:

RICHARD J. CONWAY, Esquire
BRADLEY WINE, Esquire
NICHOLAS MATTIA, Esquire
Dickstein Shapiro Morin and Oshinsky
2101 L Street, N.W.
Washington, D.C. 20037
(202) 828-2235

TODD GOODMAN, Client Representative

APPEARANCES: (Cont'd)

For the Defendant:

HAROLD D. LESTER, JR., Esquire
JOSHUA E. GARDNER, Esquire
JOHN C. EKMAN, Esquire
ALAN J. LO RE, Esquire
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0326

P R O C E E D I N G S

(3:00 p.m.)

THE CLERK: The United States Court of Federal Claims is now in session, the Honorable Christine Odell Cook Miller presiding. God bless this Honorable Court. Now calling the case of Delmarva Power and Light Co. v. United States, Docket No. 04-34C for a status conference.

THE COURT: Good afternoon, gentlemen.

ALL: Good afternoon.

THE COURT: Please be seated. Please be seated. Mr. Conway?

MR. CONWAY: Good afternoon, Your Honor.

THE COURT: How are you today?

MR. CONWAY: I'm fine.

THE COURT: Would you introduce the gentlemen who are with you?

MR. CONWAY: I'd be glad to, Your Honor. This is Bradley Wine and Nicholas Mattia of Dickstein Shapiro and Mr. Todd Goodman, client representative.

THE COURT: I'm always glad to have a client representative. Every time I see one I think we'll get a perception in the case that leads the disposition, so thank you for coming, Mr. Goodman. We got off to what I thought was a good start in this

19 as third-party Plaintiffs or Defendants.

I note that there are complications with some of the joinder rules, that some of the Judges in the past have differed in terms of the enforceability of certain of the joinder rules, and we're trying to get a little bit of a handle around that right now to understand the various permutations that various Judges have gone through in considering those.

THE COURT: Well, you had oral argument on December 3rd. I tried to indicate that, at least on the issues that we discussed, Plaintiffs were going to prevail, and is that the next step to issue ruling 1? The reason that Judge George Miller asked me to take this case is you know, he held a twin oral argument right before mine. I truly did not know his was going on at all, and the case was so similar. And I apologize for the parties having to duplicate their efforts, but he was of the same view.

So I don't know if that's a starting point. What I find difficult is that the same questions existed when we discussed the matter initially, and I just don't know what progress that we therefore made. I thought there was a real commitment to try to settle the case. One of the purposes of settling is to try to put a monetary value on the very contingencies that

you're discussing other than what you call double payment. That would have to be ironed out, and I think the manner suggested is a good one.

But otherwise, we just proceed issue by issue, and I see no reason to defer the issue of how we deal with PSEG at all. Why wait? You can bring them into this case insofar as they're asserting an interest, and they can prosecute their case to Judge Futey, which is fine with me, if you regard the concerns are slightly different.

In any event, if they were brought into the case, it would be bound insofar as the double payment was concerned because that's really what's going on here as opposed to true consolidation of the cases.

However, if it would be easier legally to have all three cases consolidated and proceed as one, I mean, let me know, and I'll discuss the matter with Judge Futey. But we've just added one case, and we're thinking about adding another. I'd like to move forward. We haven't really done very much at all in the past three or four months.

MR. LESTER: Your Honor, with regard to that, I think probably by the end of next week, we could file a motion that probably addresses both options, the consolidation option and the option of

bringing in PSEG in some other manner and in some ways, sort of let the Court decide what it thinks is best. I understand all of it's discretionary with the Court anyway, so I think perhaps if we present a couple of different options, then the Court will at least have more to discuss and think about.

THE COURT: Well, another way of dealing with it rather than file a motion is to see if you can sit down and agree with Plaintiff as to how you both want this to proceed, assuming that I would enter an order accordingly and work any matters out with Judge Futey that I need to. I don't see why you need to file a motion if you agree at least on the mechanics while Plaintiff may think that your time would be better spent trying to settle the case.

I just thought in terms of our oral argument that one of the defenses that the government has is just not at this point going to prevail. And the Plaintiff does have a different kind of case that's in a different posture than the other Plaintiffs, and I think it would be really, really difficult when you talk about taking discovery to find out any situation whether somebody would have paid more or less for an acquisition for the simple reason that these acquisitions are not out there in the marketplace.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th of January 2007, a copy of foregoing "DEFENDANT'S MOTION TO CONSOLIDATE OR, IN THE ALTERNATIVE, FOR ISSUANCE OF A SUMMONS PURSUANT TO RCFC 14(a) AND NOTICE PURSUANT TO RCFC 14(b)" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s\Stephen Finn