**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on July 20, 2007)

| | |
|---|---|
| **PSEG NUCLEAR, L.L.C.** and **PUBLIC SERVICE ELECTRIC AND GAS COMPANY**, Plaintiffs, | |
| v. | No. 01-551C (Judge Futey) |
| **THE UNITED STATES**, Defendant. | |

**PLAINTIFFS' STATUS REPORT**

Pursuant to this Court's June 11, 2007 order, the Plaintiffs file this status report to update the Court regarding the progress of the arbitration involving Plaintiff PSEG Nuclear, L.L.C. and its corporate sibling PSEG Power, L.L.C. (together "PSEG") and the plaintiffs in *Delmarva Power & Light Company v. United States*, Nos. 04-0034C & 04-0036C ("Delmarva Plaintiffs"). On June 20, 2007, the arbitration panel issued an opinion and order ("June 20 Award"), a copy of which is attached hereto. (Attachment 1). The June 20 Award rejected the Delmarva Plaintiffs' claims of waiver, laches, and delay, and held that the Delmarva Plaintiffs "assigned the takings claims at issue here to PSEG, and that ACE/Delmarva's initiation of its taking litigation and its refusal to dismiss that litigation breached the PAs." (June 20 Award at 24.)

On June 25, 2007, PSEG filed a complaint in the Superior Court of New Jersey, Mercer County seeking confirmation of the June 20 Award. On July 2, 2007, the Superior Court of New Jersey, Mercer County, issued an order to show cause why the June 20 Award should not be confirmed and set a briefing schedule for the parties to respond to the show cause order.

On July 2, 2007, the Delmarva Plaintiffs filed a Motion to Vacate Arbitration Ruling in their case in this Court (Nos. 04-0034C and 04-0036C), asking that Judge Miller set aside the June 20 Award and find that PSEG waived its right to enforce its rights under the PAs. On July 12, 2007, the Delmarva Plaintiffs filed a motion in the New Jersey state court proceedings asking the court to stay those proceedings in favor of the Motion to Vacate Arbitration Ruling pending before Judge Miller. On July 17, 2007, the New Jersey state court issued an order permitting the Delmarva Plaintiffs to request a stay in their opposition to the July 2 order to show cause. The New Jersey state court set a hearing on the order to show cause for August 9, 2007, and scheduled a teleconference to discuss the status of Court of Federal Claims proceedings for August 1, 2007. The New Jersey state court declined to hear the stay issue separately or as an initial matter as requested by the Delmarva Plaintiffs.

On July 19, 2007, PSEG filed with Judge Miller a Motion for Leave to Intervene for the Limited Purpose of Opposing Plaintiffs' Motion to Vacate Arbitration Award, along with its Opposition to the Delmarva Plaintiffs' Motion to Vacate Arbitration Ruling. A copy of these filings is also attached hereto (Attachments 2 and 3). On that same day (July 19), the Defendant also filed an Opposition to the Motion to Vacate. (Attachment 4).

In light of the recent activities detailed above, Plaintiffs respectfully request that the stay remain in place in this case for a period of up to 60 additional days to allow for the completion of proceedings in the New Jersey state court and to allow Judge Miller the opportunity to consider the opposing positions submitted by the parties in the *Delmarva* case. Plaintiffs also request leave to inform the Court within 30 days of any decision by the New Jersey state court or Judge Miller. Counsel for the Defendant has stated that Defendant does not oppose this request for a continuing stay, provided the *Delmarva* and *PSEG* cases stay on the same procedural schedule,

and leave to report within 30 days any ruling of the respective courts as to the merits of the matters summarized above.

Dated: July 20, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiffs
PSEG Nuclear, L.L.C. and
Public Service Electric and Gas Company

*Of Counsel*:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128

(202) 663-8000
(202) 663-8007 (fax)

**IN THE MATTER OF THE ARBITRATION OF:**

| | |
|---|---|
| PSEG POWER LLC, and PSEG NUCLEAR LLC, Claimants, | |
| v. | |
| PEPCO HOLDINGS, INC., ATLANTIC CITY ELECTRIC CO., and DELMARVA POWER AND LIGHT CO., Respondents. | |
| ATLANTIC CITY ELECTRIC CO., and DELMARVA POWER AND LIGHT CO., Claimants, | |
| v. | |
| PSEG POWER LLC, and PSEG NUCLEAR LLC, Respondents. | |

**Opinion and Order**

The parties have filed reciprocal arbitration demands seeking this Panel's consideration of whether PSEG Power LLC and PSEG Nuclear LLC (collectively, "PSEG") waived its right to arbitrate its claim that Atlantic City Electric Co. ("ACE") and Delmarva Power and Light Co. ("Delmarva," and, collectively with ACE,

"ACE/Delmarva")[1] assigned Fifth-Amendment-based takings claims against the United States to PSEG, and, if not, whether such assignments were made. For the reasons outlined below, we find that PSEG did not waive or otherwise lose its right to arbitrate, and that the takings claims at issue were assigned to PSEG.

## FACTS & PROCEDURAL POSTURE

The factual background is largely undisputed and is set forth in material part below.

### I. Spent Nuclear Fuel Regulation

Spent nuclear fuel ("SNF") is fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing. 42 U.S.C. § 10101(23). Under the Nuclear Waste Policy Act of 1982 ("NWPA"), "the Federal Government has the responsibility to provide for the permanent disposal of . . . [SNF] as may be disposed of in order to protect the public health and safety and the environment." Id. § 10131(a)(4). However, "the costs of such disposal should be the responsibility of the generators and owners of such . . . [SNF]." Id.

Pursuant to the above mandate, the Department of Energy ("DOE") was tasked with constructing a facility for the long-term storage of SNF. See id. § 10131(b). In order to cover the costs of building and maintaining a facility to house SNF, among other materials, the NWPA authorized DOE "to enter into contracts with any person who generates or holds title to . . . [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C.

---

[1] Although PEPCO Holdings, Inc. ("PEPCO"), the parent of ACE and Delmarva, is named as a respondent in PSEG's demand, it is not a claimant in ACE/Delmarva's demand and apparently is not being represented by ACE/Delmarva's lawyers (according to the signature blocks on the briefs). Because there has been no attempt by PEPCO to object to the arbitration, it should be bound by this decision.

§ 10222(a)(1). Renewal of nuclear facilities' licenses to operate was conditioned on entering into such contracts. Id. § (b)(1)(A).

DOE adopted a form contract – the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract" or "Contract") – that nuclear facilities were required to execute. 10 C.F.R. § 961.11. Under the Standard Contract, nuclear facilities pay a one-time fee for past nuclear energy production and a continuing fee for on-going production, id. art. VIII.B, and DOE was required to complete its storage facility by January 31, 1998. The nuclear facilities upheld their end of the bargain, but DOE did not. DOE projects that a federal storage facility will be available at the earliest by 2010, if then. 59 Fed. Reg. 27007, 27008 (May 25, 1994).

## II. THE PURCHASE AGREEMENTS

On September 27, 1999, PSEG purchased ACE/Delmarva's minority interests in three facilities: Hope Creek Station ("Hope Creek"), Salem Station ("Salem") and Peach Bottom Station ("Peach Bottom," and, collectively with the other facilities, the "Facilities") pursuant to three purchase agreements (the "PAs").[2] See Opening Jurisdictional Brief of ACE/Delmarva at 2. PSEG also purchased the majority interests in Hope Creek and Salem from Public Service Electric & Gas Co. ("PSE&G").

The PAs define the Purchased Assets to include SNF. PAs § 2.1(c) (including Nuclear Materials, a term defined in § 1.1(91) to include SNF). Section 2.6 gives PSEG "all rights of recovery from third parties and the Department of Energy

[2] The PAs govern different facilities, but their substantive terms are identical. Opening Merits Br. of PSEG at 3.

relating to, arising from or in connection with the [DOE's] failure to take [SNF]."

Similarly, Section 2.1(1) includes in the purchased assets:

> All claims of Seller [ACE/Delmarva] relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims describe in Section 2.2(1).[3]

Section 2.1(m) adds:

> [t]he rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date, other than the claims described in Section 2.2(m).[4]

PSEG also bargained for the right "exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Purchased Assets or Assumed Liabilities . . . ." PAs § 2.5(b).

The PAs have a standard no-waiver clause, providing that "[t]he failure of a Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights." PAs § 10.5.

---

[3] The § 2.2(l) carve-out is for DOE refunds for decontamination and decommissioning costs.

[4] The § 2.2(m) carve-out is for particular litigations of no relevance here. The other Excluded Assets are also not pertinent to the present issues.

The PAs are governed by New Jersey law, PAs § 10.10, and provide for arbitration under the American Arbitration Association rules of "any dispute between Seller and Buyer . . . relating to or arising out of any provision of" the PAs, PAs § 8.6.

## III. THE LITIGATIONS

The current arbitration concerns separate actions brought against DOE by PSEG and ACE/Delmarva, respectively. The first was brought by PSEG to recover for, among other things, DOE's breach under the Standard Contracts in failing to take SNF by 1998. Later, ACE/Delmarva sued DOE for failure to provide just compensation pursuant to the Fifth Amendment in exchange for the "taking" that resulted from its failure to take SNF.

### A. PSEG's Suit Against DOE

PSEG filed its suit in the Court of Federal Clams ("CoFC") on September 26, 2001. That suit contains claims for breach of the Standard Contracts, for breach of the implied covenant of good faith and fair dealing, and to recover compensation for a taking. Sellers' Appendix ("SA"), Tab 2 at 8-11. The facts underlying all claims are that DOE promised to take SNF from Hope Creek and Salem Station, but failed to do so, and also kept the money paid to DOE under the Standard Contracts.[5] On January 6, 2004,

[5] PSEG did not sue DOE with respect to Peach Bottom because its contract claims against the DOE were settled prior to the filing of the PSEG suit by Peach Bottom's majority owner Exelon. While the settlement was rejected by the Eleventh Circuit for certain reasons regarding the source of the funds, a subsequent settlement was reached after the rejection. Transcript of Arbitration Proceedings of May 24, 2007 ("Tr.") at 157:8-158:22. Counsel for ACE/Delmarva argued that the Peach Bottom settlement shows that the government is open to settling SNF contract claims without settling the takings claims. Id. at 107:24-108:6. But Counsel for PSEG responded that the government's current insistence that PSEG settle its contract claims with all associated takings claims comes from the government's experience in settling Peach Bottom, as, while it believed it was ending the entire matter with the settlement, it found itself facing takings claims notwithstanding the settlement. Id. at 135:18-136:14. Whether the government is willing to settle the SNF contract claims in the absence of the takings claims is not relevant here; we must simply decide who owns the takings claims.

PSEG amended its complaint to add PSE&G as a plaintiff, presumably in case DOE argued that the takings claims were not transferable by PSE&G.

On January 31, 2005, the CoFC dismissed PSEG's breach of contract claims on jurisdictional grounds and stayed the remaining claims pending appeal. PSEG's Appendix ("PA") at A16. On November 20, 2006, some 22 months later, the Federal Circuit reversed the CoFC's jurisdictional ruling. PA at A37.

On January 5, 2007, DOE moved to consolidate PSEG's case with ACE/Delmarva's, and PSEG's case was subsequently stayed on PSEG's motion for stay pending completion of binding arbitration. PA at A46.

**B. ACE/Delmarva's Suit Against DOE**

On September 26, 2003, representatives of ACE/Delmarva met with representatives of PSEG to discuss ACE/Delmarva's intention to sue DOE based on takings claims that ACE/Delmarva believed it could bring arising from DOE's failure to take SNF from the Facilities. Opening Jurisdictional Br. of ACE/Delmarva at 3. PSEG asserted that any such lawsuit would contravene the PAs, as all claims were assigned to PSEG. Id. ACE/Delmarva apparently explained why it believed the takings claims were distinct from the assigned claims, and PSEG offered no response. Id. (citing Affidavit of Nicholas W. Mattia, at SA Tab 1 ¶¶ 4-10); see also Declaration of Harold W. Borden at A3-A5 ¶¶ 2-8.

ACE and Delmarva filed separate takings actions in the CoFC on January 13, 2004. On December 2, 2004, both ACE and Delmarva added "protective" breach of contract and breach of the implied covenants of good faith and fair dealing claims

(making the suits essentially identical to the PSEG suit). The ACE and Delmarva cases were consolidated on January 21, 2005. The CoFC denied DOE's motion for summary judgment in the consolidated case on July 1, 2005.

ACE/Delmarva then subpoenaed documents from PSEG on September 29, 2005. In response, on October 6, 2005, PSEG again asserted that ACE/Delmarva had no right to pursue the takings claims under the PAs and requested that those claims be voluntarily dismissed forthwith. Documents Relating to ACE/Delmarva – PSEG Arbitration ("Documents"), Tab II.C. PSEG also threatened to initiate arbitration under the PAs if ACE/Delmarva continued to press the takings claims. Id. ACE/Delmarva replied by letter (from an officer of Pepco Holdings, Inc.) that it would not dismiss those claims because it did not believe that they overlapped PSEG's claims and it did not intend to and could not have transferred them in the PAs. Documents, Tab II.D. PSEG replied with a letter reiterating its position regarding assignment of the claims and another letter objecting to the subpoena. Documents, Tabs II.E & II.F.

ACE/Delmarva moved on January 12, 2006 to compel production. PSEG responded by again asserting that the takings claims did not belong to ACE/Delmarva in light of the PAs. The CoFC granted the motion to compel (without ruling on PSEG's assignment claims), SA, Tab 5; SA, Tab 8 at 7 (noting that the CoFC "has not addressed the issue of the impact of the assignment of claims directly"), and PSEG produced the requested documents.

On January 5, 2007, DOE moved to consolidate the ACE/Delmarva and PSEG cases. ACE/Delmarva opposed consolidation (as did PSEG). See PA at A43;

Opening Jurisdictional Brief of PSEG, at 11; Tr. at 47:13-48:11. PSEG followed this with a Notice of Dispute under the PAs to ACE/Delmarva. Pursuant to the Notice of Dispute, on April 5, 2007, PSEG served ACE/Delmarva with the arbitration demand that resulted in this proceeding. ACE/Delmarva responded on April 16, 2007 with its own arbitration demand, which was superseded by an amended demand served April 23, 2007.

Judge Miller issued an order on April 12, 2007 denying in part without prejudice and granting in part[6] DOE's consolidation motion and stayed the case temporarily pending this arbitration. SA, Tab 8 at 2.

### C. The Arbitration Claims

PSEG's arbitration demand seeks declarations that: (1) ACE/Delmarva assigned all claims including the takings claims to PSEG under the PAs; (2) PSEG received the right to control all litigations concerning SNF including the takings claims under the PAs; (3) ACE/Delmarva breached the PAs by initiating the Delmarva litigation and by refusing to dismiss; (4) ACE/Delmarva breached the PAs by not giving PSEG pre-closing notice of the existence of the takings claims; (5) ACE/Delmarva breached the PAs by failing to attempt to secure the government's consent to assign the takings claims to PSEG; and (6) the PAs obligate ACE/Delmarva to assign to PSEG all earnings from the takings claims.

ACE/Delmarva's demand seeks: (1) consideration of ACE/Delmarva's claim that PSEG's Notice of Dispute and demand for arbitration are invalid; (2) a declaration that the Notice of Dispute and arbitration demand are barred by laches or

[6] It is not clear what part of the motion was granted. See Tr. at 130:5-10.

contain claims not subject to arbitration; and (3) a dismissal of the claims set forth in PSEG's arbitration demand.

## ANALYSIS

### I. THE CLAIMS AT ISSUE ARE ARBITRABLE

ACE/Delmarva contends that the present dispute over whether it assigned the SNF takings claims to PSEG is beyond the scope of the arbitration clauses in the PAs. Opening Jurisdictional Br. of ACE/Delmarva at 18. Although ACE/Delmarva recognizes that the clauses are broad enough to encompass any dispute arising out of any provision of the PAs, it contends that, because the takings claims are not assignable and cannot provide PSEG with any benefit, they cannot arise out of any provision of the PAs. Id. This argument is essentially a recasting of ACE/Delmarva's arguments as to why the claims were not assigned by the PAs. But it seems to us logical to the point of being tautological that, if the PAs confer on this Panel jurisdiction to decide whether certain claims ***were*** assigned, we must also have jurisdiction to decide whether the same claims ***were not*** assigned. ACE/Delmarva does not appear to contend that the Panel lacks jurisdiction over the former question, only over the latter. Accordingly, ACE/Delmarva's contention that the present disputes are beyond the scope of the arbitration clause is without merit.

### II. PSEG'S CLAIMS HAVE NOT BEEN WAIVED

ACE/Delmarva's more serious objection to arbitrability is that PSEG lost its right to arbitrate this dispute due to its litigation conduct in the ACE/Delmarva case and its delay in bringing this arbitration. Initially, we must decide whether this question is more properly addressed by the CoFC.

### A. This Panel May Resolve the Waiver/Laches/Estoppel Question

"The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983). ACE/Delmarva asserts that this general rule does not apply to its allegation here that PSEG waived arbitration through litigation conduct, relying principally on the Third Circuit's recent decision in Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007), in which the court stated that it "has long decided questions of waiver based on litigation conduct instead of referring the issue to an arbitrator." Id. at 217.

Ehleiter and the cases discussed therein involve parties litigating before a particular court when one of those parties moves for a stay in order to arbitrate, and the other objects based on the movant's waiver of the arbitration right through litigation conduct. Those cases hold that, as is apparent, a court is both in a better position and more suited than arbitrators to determine whether the litigation conduct at issue evinces a waiver, and to control its own proceedings and address abuses of the judicial system. See, e.g., Ehleiter, 482 F.3d at 218.

Here, on the other hand, the parties have not been litigating the merits of their cases before the same Judge, and there continues to be no court case to which both ACE/Delmarva and PSEG are parties. Indeed, ACE/Delmarva has opposed DOE's consolidation motions that would put both parties before the same Judge. Thus, no court

is in any better position than this Panel to determine whether PSEG's litigation conduct waived its arbitration rights. Judge Miller, when given the opportunity to deny a stay in the ACE/Delmarva case based on PSEG's litigation conduct, declined to do so.[7] SA, Tab 7 at 8. Moreover, ACE/Delmarva itself submitted the litigation waiver issue to this Panel in its arbitration demand, and did not suggest that this Panel did not have jurisdiction to decide the issue until weeks later.[8]

In sum, we do not believe that Ehleiter stands for the proposition that only a court may decide issues of waiver of arbitrability based on litigation conduct. See Ehleiter, 482 F.3d at 221 ("[W]e hold that waiver of the right to arbitrate based on litigation conduct remains ***presumptively*** an issue for the court to decide . . . .") (emphasis added). This is especially true in a case, such as this, in which both parties have submitted the issue to arbitration and there is no single court before which both parties' litigation conduct took place. Accordingly, we have jurisdiction to consider ACE/Delmarva's litigation waiver defense to arbitration.

---

[7] ACE/Delmarva's assertion that Judge Miller "retained jurisdiction of [sic] the question whether [PSEG] by its delay and litigation conduct has waived the right to arbitrate," Opening Jurisdictional Br. of ACE/Delmarva at 11, is actually contradicted by the statement by the court upon which it relies. The court said that "should the arbitrators fail to consider delay in the arbitration proceeding, the court cautions [the] parties that it will address the issue." SA, Tab 7 at 8-9. This implies that this Panel can decide the issue, and if it does, then the court need not do so.

To the extent that ACE/Delmarva is contending that Judge Miller erred in granting the stay because she did not rule on the litigation conduct waiver question, that is an issue for the Federal Circuit, not this Panel.

[8] ACE/Delmarva's contention that it "can hardly [be] fault[ed] for the fact that the [Ehleiter] issue was raised on May 9th; Ehleiter was raised by the Panel at the outset of the prehearing conference," Responsive Jurisdictional Br. of ACE/Delmarva at 3, is puzzling. Ehleiter did not establish new law in the Third Circuit and ACE/Delmarva could have raised the issue before Judge Miller or in an answer to PSEG's arbitration demand.

**B. PSEG Did Not Forfeit its Right to Arbitration**

ACE/Delmarva relies on three related theories to contend that PSEG forfeited its rights to arbitration: waiver through litigation conduct, laches and equitable estoppel. ACE/Delmarva has the burden of proving these defenses. See Great Western Mortgage Corp. v. Peacock, 110 F.3d 222, 233 (3d Cir. 1997) ("Given the burden that Peacock bears in demonstrating waiver, and her lack of evidence in support of her assertions, we are satisfied that Great Western clearly preserved the right to refer Peacock's claim to arbitration. As we have stated, waiver is not to be lightly inferred.").

**1. Waiver by Litigation Conduct**

In order to show that PSEG waived its right to arbitrate the question whether the takings claims at issue were assigned under the PAs, ACE/Delmarva must show, among other things, that the conduct caused it prejudice. "'[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived' by litigation conduct." Ehleiter, 482 F.3d at 222 (quoting Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 925 (3d Cir. 1992)). A "nonexclusive list of factors relevant to the prejudice inquiry" with respect to litigation conduct includes: "[1] the timeliness or lack thereof of a motion to arbitrate . . . [; 2] the degree to which the party seeking to compel arbitration [or to stay court proceedings pending arbitration] has contested the merits of its opponent's claims; [3] whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; [4] the extent of its non-merits motion practice; [5] its assent to the [trial] court's pretrial

orders; and [6] the extent to which both parties have engaged in discovery." Id. at 222-23 (quoting Hoxworth, 980 F.2d at 926-27).

Here, the first factor – timeliness – is offset by the third – notice of intent to seek arbitration. Although PSEG delayed in filing this arbitration after being on notice that ACE/Delmarva was litigating the takings claims, it made clear to ACE/Delmarva from the outset its objections and intention to arbitrate. The remaining factors are difficult to assess; PSEG's litigation conduct has not been as a party to ACE/Delmarva's suit, but rather as a third-party opposing a document subpoena in that case. Indeed, the factors listed above measure the ***voluntary*** actions in the litigation at issue by the party seeking arbitration. Such action is absent here. All of PSEG's actions taken in ACE/Delmarva's suit identified by ACE/Delmarva – "opposing amotion to compel discovery, later producing 38,500 pages of documents [under court order] and more recently responding to the Court's Order to Show Cause," Opening Jurisdictional Br. of ACE/Delmarva at 13 – were involuntary. ACE/Delmarva has failed to carry its burden of showing that PSEG actively participated in the takings litigation so as to waive its right to arbitration of the present claims.

**2. Laches And Equitable Estoppel**

For ACE/Delmarva to prevail on the defense of laches, it must show both an unexplained and inexcusable delay by PSEG in asserting its rights, and resulting prejudice. Mitchell v. Alfred Hofmann Inc., 48 N.J. Super. 396, 403 (App. Div. 1958); see also Kepner-Tregoe, Inc. v. Executive Dev., Inc., 79 F. Supp. 2d 474, 487 (D.N.J. 1999).

ACE/Delmarva argues that PSEG delayed over three years in filing this arbitration after being given notice of ACE/Delmarva's intention to file takings claims, and also acquiesced in ACE/Delmarva's assertion of those claims by adding PSE&G to its own suit containing takings claims for Hope Creek and Salem. However, the latter point suggests that PSEG agreed with ACE/Delmarva that PSEG itself might not be able to bring the takings claims – and has nothing to do with whether PSEG thought that the claims were assigned under the PAs.

There is no dispute that PSEG waited over three years from the filing of ACE/Delmarva's suit to file its dispute notice that initiated this arbitration. But ACE/Delmarva must show that this delay was inexplicable and unreasonable – that it "lull[ed] [it] into a false sense of security or belief that [PSEG] acquiesced in what [ACE/Delmarva] [was] doing." Murphy v. Trapani, 255 N.J. Super. 65, 75 (App. Div. 1992). It has not made this showing. PSEG objected repeatedly to ACE/Delmarva proceeding with the takings claim, based on the PAs' assignment of the claims and its rights to arbitrate over the objections. See id. (rejecting laches defense despite two-year delay in filing as plaintiffs immediately complained about defendants actions when they were taken); see also King v. Innovation Books, 976 F.2d 824, 832-33 (2d Cir. 1992) (rejecting laches when plaintiff had timely warned defendants of his claims). All of PSEG's actions were consistent with its belief that ACE/Delmarva assigned all of its rights to PSEG, including the takings claims.[9] ACE/Delmarva was on notice of PSEG's

[9] The dissent points to a letter from PSEG to ACE/Delmarva dated April 20, 2005 in which PSEG stated that it "simply has no interest or desire to prosecute or defend" the sort of claims ACE/Delmarva was pressing in the ACE/Delmarva litigation, and suggests that statement is irreconcilable with PSEG's position here. We disagree. It is one thing to have no interest in pursuing a particular legal theory or

objections, and knew as well their basis in the clear language of the PAs discussed below. Nonetheless, it proceeded to litigate. If ACE/Delmarva wanted to resolve PSEG's stated objections sooner, it could have filed for arbitration. ACE/Delmarva's litigation was undertaken with a clear-eyed awareness of the risks, including the cost of legal fees.

We also observe that the PAs themselves plainly state that non-assertion of rights shall not be construed as a waiver of those rights. Although the prevailing view is that such clauses themselves may be waived by agreement or conduct, see 13 Williston on Contracts § 39:36 (4th ed. 2007 supp.), here PSEG's conduct was consistent with the non-waiver clause.

PSEG's delay in bringing an arbitration while its own claims before the CoFC were dismissed is perhaps understandable. During the period before its claims were resurrected, PSEG stood to gain little if anything from expending its efforts and money in arbitrating against ACE/Delmarva over claims it could not bring without DOE's consent. Accordingly, it was logical for PSEG to stand by during the pendency of its appeal after having already made its objections and their basis clear to ACE/Delmarva.

Because of PSEG's repeated assertions of its rights under the PAs and the PAs' non-waiver clause, we find on balance that PSEG's delay was not unreasonable and should not have led ACE/Delmarva to conclude that PSEG acquiesced in its takings suit;

---

claim, perhaps for strategic or valuation reasons, but quite another to yield to another the right to pursue that theory or claim. PSEG's April 20 letter suggests only the former, and its communications both before and after the April 20 letter (orally in September 2003 and by a letter dated October 6, 2005) explicitly deny the latter.

therefore we reject the laches defense.[10] For the same reasons, we reject ACE/Delmarva's equitable estoppel defense.

## III. ACE/DELMARVA ASSIGNED THE TAKINGS CLAIMS TO PSEG

Having rejected ACE/Delmarva's jurisdictional and equitable defenses, we now reach the merits of the dispute – whether ACE/Delmarva assigned the takings claims to PSEG in the PAs.

### A. The Takings Claims Are Clearly Covered by the Assignments in the PAs

Under the PAs, ACE/Delmarva assigned "[a]ll claims of Seller [ACE/Delmarva] relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) . . . and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets." PAs § 2.1(l). The PAs also grant PSEG "all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the [DOE's] failure to take [SNF]." Id. § 2.6. PSEG further received the right "exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Purchased Assets [which include SNF]." Id. § 2.5(b).

[10] Although we do not reach the second element of laches – prejudice – we note in passing that ACE/Delmarva's proof of prejudice appears to be thinner than ACE/Delmarva suggests. ACE/Delmarva contended at argument that prejudice should be measured hypothetically, in that, had PSEG brought its arbitration claim in the fall of 2003, it likely would have included Peach Bottom and, had PSEG won, ACE/Delmarva never would have brought its suit at all. Tr. at 80:5-81:5. However, we believe that prejudice should be measured based on what actually happened. In other words, the proper question is, in light of the delay, what did ACE/Delmarva do that would be to its detriment if it now loses this arbitration. ACE/Delmarva is not contending that the Peach Bottom settlement was contrived in bad faith to rebut its prejudice argument here. Tr. at 107:8-10.

These broad assignments make no exceptions for particular kinds of claims, and the detailed Excluded Assets list in the PAs make no mention of any takings claims. See PAs § 2.2. It is hard to imagine a more comprehensive assignment of claims. On their face, the PAs leave no doubt that the takings claims at issue here were assigned to PSEG and that PSEG received the exclusive right to control the litigation over the claims.

In the face of this unmistakable language, ACE/Delmarva makes two principal arguments as to why the takings claims were not assigned: (1) they arise independent of the Standard Contract, and (2) they could not have been assigned as a matter of law.

The first argument ignores the second half of § 2.1(l), which goes beyond claims arising out of the Standard Contract and covers "all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets," as well as § 2.6, which confers to PSEG "all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the Department of Energy's failure to take Spent Nuclear Fuel." The Purchased Assets explicitly include SNF, and the takings claims indisputably arise out of or are in connection with DOE's failure to take SNF. Accordingly, it is irrelevant whether the takings claims arise from the Standard Contract or from some other source – in either case, they are covered by the PAs assignment clauses.[11]

[11] We note that, while ACE/Delmarva quotes Judge Miller's opinion denying summary judgment in stating that "[t]he court also noted that Sellers' takings claim 'is not predicated upon any rights emanating from the Standard Contract,'" Opening Jurisdictional Br. of ACE/Delmarva at 5, this is a distortion of the actual statement. The opinion was simply describing another opinion in stating that a takings claim ***might*** be viable "***insofar*** as the takings claim is not predicated upon any rights emanating from the Standard Contract." SA, Tab 4 at 4 (emphasis added). This is hardly an actual finding that the claim does not arise

As to the second argument, ACE/Delmarva contends that the Assignment of Claims Act (or Anti-Assignment Act)[12] bars an assignment of the claims and, alternatively, that takings claims are "personal" and cannot be assigned in any event.[13] We need not dwell on the latter point, as ACE/Delmarva offers no authority in support of it nor any rationale to distinguish takings claims from any other claim with respect to assignability.[14]

The Anti-Assignment Act argument fails for two independent reasons: (1) the Act is not absolute, and therefore cannot render an assignment void *ab initio*, and (2) the Act may not be invoked by a party other than the United States.

It is undisputed that the government may consent to an assignment of a claim that would otherwise violate the Anti-Assignment Act. See, e.g., Vt. Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 240 (2006) ("The prohibitions of

---

from the rights in the Standard Contract. Indeed, the very opinion that Judge Miller was describing – Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005) – found that, if both a takings claims and a contract claim simultaneously existed, the contract claim would provide the preferable basis for recovery. Id. at 187; cf. Slack v. McDaniel, 529 U.S. 473, 485 (2000) ("[T]he 'Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of . . . .'") (quoting Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

[12] While ACE/Delmarva points out that the Assignment of Claims Act, 31 U.S.C. § 3727 is different from the Anti-Assignment Act, 41 U.S.C. § 15, courts have often referred to the Assignment of Claims Act as the Anti-Assignment Act (for obvious reasons) and we use the terms interchangeably to refer to the former statute.

[13] To the extent that ACE/Delmarva's position is that the anti-assignment statute should be considered by the Panel in determining whether ACE/Delmarva ***intended*** to assign the takings claims, it must be rejected. The PAs are unambiguous on this point, and therefore intent is irrelevant. Counsel for ACE/Delmarva recognized as much at argument, and it appears that the parties have agreed that the PAs are unambiguous and are not presenting evidence as to intent. See, e.g., Tr. at 21:12-17; 109:20-110:18; 140:14-17.

[14] ACE/Delmarva's argument is essentially that the claims are *per se* unassignable because the buyer of such a claim would be doubly benefiting – both from the depreciated value of the subject of the sale and from the takings claim. But this presupposes that none of the purchase price is attributable to the claim itself. Because that assumption is not a necessary one, ACE/Delmarva's justification for the assignment bar is unconvincing. Even if the assumption were correct, it could simply reflect the parties' views of the merits of the claim at the time the PA's were executed.

the Anti-Assignment Acts notwithstanding, 'assigned contracts are valid when the assignment takes place by operation of law, or when the government consents to and recognizes the assignment.'") (quoting Rochester Gas and Elec. Corp. v. United States, 65 Fed. Cl. 431, 437 (2005)). Accordingly, ACE/Delmarva's contention that it could not have assigned the takings claims at issue rings hollow; although it may be true that the government generally would not agree to such an assignment, that does not change the fact that it is at least possible for the assignment to take place.

Moreover, even if the Anti-Assignment Act does bar PSEG from asserting the claim, that Act may not be invoked by ACE/Delmarva to void the assignment. "The Anti-Assignment Act is for the government's protection and only the United States may assert it." United States v. Certain Space in Property Known as Chimes Bldg., 320 F. Supp. 491, 496 (N.D.N.Y. 1970), aff'd, 435 F.2d 872 (2d Cir. 1970). While "[a]n invalid attempted assignment does not forfeit the claim [(]it leaves it as it was before the purported assignment[),] . . . the assignment remains enforceable as between the parties to the assignment." Saint John Marine Co. v. United States, 92 F.3d 39, 45 (2d Cir. 1996); see also 91 Sonja Larsen et al., Corpus Juris Secundum: United States § 196 ("[T]he invalidity of the assignment will not enable the assignor to recover from the United States after it has paid the claim to the assignee."). ACE/Delmarva does not point to any cases in which the Act has been used to invalidate an assignment as between private parties.

ACE/Delmarva argues that it must be able to bring the takings claims if PSEG may not bring them. Assuming that DOE would not consent to the assignment and

that PSEG may not bring the takings claims, ACE/Delmarva's argument still relies on the incorrect assumption that some party has to be able to bring the claims. Indeed, ACE/Delmarva goes so far as suggesting that it would be ***unconstitutional*** for a governmental taking to go uncompensated. See, e.g., Responsive Merits Br. of ACE/Delmarva at 2-3. That is simply an overstatement. Indeed, if the failure to take SNF actually does constitute a taking, it could go uncompensated if neither ACE/Delmarva nor PSEG actually sought compensation from DOE. It is not reasonable to interpret the Anti-Assignment Act, which exists solely to protect the government, to force the government to answer for claims against it.

In sum, we find that the PAs' comprehensive assignment language included the takings claims at issue and that the Assignment of Claims Act does not alter that conclusion or void the assignment as between ACE/Delmarva and PSEG. Accordingly, PSEG was assigned both the claims themselves and the right to control litigation over them.

**B. ACE/Delmarva's Judicial Estoppel Argument Is Without Merit**

ACE/Delmarva contends that PSEG's "pursu[it] [of] a sellers takings claim on behalf of one of its sellers [PSE&G]" is flatly inconsistent with its position that ACE/Delmarva has no right to pursue its takings claim. This argument suffers from multiple weaknesses.

The doctrine of judicial estoppel bars a party from asserting a position contrary to a position that the party has successfully asserted in previous litigation. Murray v. Silberstein, 882 F.2d 61, 66 (3d Cir. 1989); Wein v. Morris, 388 N.J. Super.

640, 658 n8 (App. Div. 2006). Here, the allegedly inconsistent positions identified by ACE/Delmarva are not in fact inconsistent at all. PSEG is not asserting in this proceeding that the takings claims at issue are not legitimate; it is asserting that they were assigned under the PAs. Moreover, PSEG has not prevailed on any position with respect to this claim, and therefore cannot be judicially estopped.

## IV. ACE'S WINDFALL ARGUMENTS CANNOT OVERCOME THE PLAIN LANGUAGE OF THE PAS

The theme behind ACE/Delmarva's arguments on the merits is that a finding that PSEG acquired the takings claims would lead to a windfall in favor of PSEG. As the argument goes, ACE/Delmarva sold its interests in the plants for less than they were worth because of DOE's failure to take SNF, and, if PSEG may assert the claims for this diminished value, it is recovering twice for the value – once in the discount and again in the recovery. Whatever rhetorical force this argument may have, it does not give the Panel license to rewrite the PAs, which plainly state (multiple times) that all claims relating to SNF are assigned to PSEG. See generally St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571 (1982).

Moreover, ACE/Delmarva and, as importantly, the Board of Public Utilities, thought ACE/Delmarva was getting fair value for the facilities regardless of any takings claims. See PA at A108-A133. In explaining its findings, the Board of Public Utilities noted, in particular, the major risks that PSEG assumed under the PAs for the "operational risks of the units" which were "particularly significant" because the facilities "have historically experienced substantial performance and cost uncertainty," and also for "all of the responsibility and risk associated with unforeseen escalation in the cost of decommissioning of the plant." PA at A20. The amount of the liabilities assumed by PSEG under the PAs remains uncertain. It is also uncertain whether the takings theory under which the claims are being brought will prove to be viable and to what extent ACE/Delmarva would be able to show any significant loss as a minority owner. Further, assuming the sellers were able to proceed with the takings claims, it is unclear whether

and to what extent any takings damages would remain for the sellers in these cases after the buyer's contract claims were resolved. See Boston Edison, 64 Fed. Cl. at 187. Thus, the idea that recognition of ACE/Delmarva's assignment to PSEG of the takings claims is against the public interest is speculative and may also be exaggerated. It appears that ACE/Delmarva is asking this Panel to ignore the deal reached in the PAs and the Board of Public Utilities' findings and apply the medieval doctrine of the just price. We cannot do so, and, to the extent that the doctrine could possibly be applied here, cf. In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 854 n.32 (3d Cir. 1994) ("[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price.") (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992) (Posner, J.), it already has been applied by the Board of Public Utilities.

* * *

We find that ACE/Delmarva assigned the takings claims at issue here to PSEG, and that ACE/Delmarva's initiation of its takings litigation and its refusal to dismiss that litigation breached the PAs. Accordingly, PSEG's other claims regarding (1) ACE/Delmarva's failure to give notice of the takings claims; (2) ACE/Delmarva's failure to make efforts to assign the claims; and (3) assignment by ACE/Delmarva to PSEG of the proceeds of the ACE/Delmarva takings case are moot.

[signature]

[signature] C. Michael Loftus

Dated: June 20, 2007

**Separate Opinion of John D. Aldock**

I respectfully dissent. In my opinion PSEG's more than three-year delay in bringing this arbitration was inexcusable and the more than $3.5 million in legal and expert fees and other company resources expended in litigating those claims over that period constituted substantial prejudice.[15] I would find that PSEG has forfeited its claim to arbitration through litigation conduct and laches.

ACE/Delmarva filed suit against the U.S. Government on January 14, 2005. PSEG issued its arbitration demand on April 5, 2007. While PSEG disputed ACE/Delmarva's right to bring its suit against the Government I believe it was incumbent on PSEG to do more.[16] I do not believe the burden was on ACE/Delmarva to initiate an arbitration solely to determine its right to litigate against the U.S. Government

Moreover, I find PSEG's letter of April 20, 2005 to counsel for ACE/Delmarva and the U.S. Government difficult to reconcile with its position in this arbitration. In that letter PSEG asked that Judge Miller be advised as follows: "PSEG Nuclear understands that Delmarva is pursuing various legal theories, such as diminution in value, which PSEG Nuclear simply has no interest or desire to prosecute or defend. PSEG Nuclear is also opposed to consolidating its pending case, No. 01-551C (J. Futey), with the Delmarva case because the cases are in completely different procedural

---

[15] While PSEG speculates that ACE/Delmarva may have brought the Peach Bottom claim even if the other claims had been assigned, I do not believe hindsight speculation on that point removes the substantial prejudice ACE/Delmarva have incurred in litigating these claims against the U.S. Government for more than three years.

[16] I do not see PSEG's inaction during the period while its claim against the Government was dismissed as a justification for delay. Judge Miller clearly treated that dismissal as temporary and urged the parties to do the same. (See April 7, 2005 Hearing transcript at p. 23 attached to PSEG's prehearing brief.)

postures." (April 20, 2005 letter from Alex D. Tomaszczuk to Richard J. Conway and Harold D. Lester.)

PSEG apparently had no interest in the ACE/Delmarva claims against the Government until the Government conditioned settlement of PSEG's separate claims against the Government on settlement or extinguishment of the ACE/Delmarva claims (PSEG's Arbitration Demand at pp. 2 and 3). While this may in part explain PSEG's delay I do not believe it justifies it.[17]

Finally, I believe that Judge Miller, who has presided over the ACE/Delmarva litigation against the U.S. Government for more than three years, and who has pending a renewed motion for consolidation of the PSEG case against the Government, is in a better position than this panel to evaluate the waiver/laches/prejudice arguments. See Ehleiter v. Grapetree Shares, Inc., 482 F.3d 207 (3d Cir. 2007).

Dated: June 20, 2007

[17] Whether PSEG had no interest in the ACE/Delmarva claims because it believed them to be without merit, or because it could not benefit from claims that ACE/Delmarva was bringing on behalf of state rate payers is not material. PSEG clearly had no interest in the claims at issue here other than as a chip in its negotiations of its separate claims against the U.S. Government.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically filed on July 19, 2007)

| | |
|---|---|
| **DELMARVA POWER & LIGHT COMPANY**,<br><br>And<br><br>**ATLANTIC CITY ELECTRIC COMPANY**,<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES**,<br><br>Defendant. | No. 04-34C and No. 04-36C<br>(Judge Christine O.C. Miller) |

**MOTION FOR LEAVE TO INTERVENE FOR THE LIMITED PURPOSE OF OPPOSING PLAINTIFFS' MOTION TO VACATE ARBITRATION AWARD**

Third Parties PSEG Nuclear, LLC and Public Service Electric and Gas Company (collectively "PSEG"), by and through the undersigned counsel, hereby move pursuant to RCFC 24(a)(2), for intervention into this matter for the limited purpose of opposing the Motion to Vacate Arbitration Ruling ("Motion to Vacate") filed on July 2, 2007, by Plaintiffs Delmarva Power and Light Company and Atlantic City Electric Company (collectively "Plaintiffs").[1]

Granting PSEG leave to intervene for the limited purpose of opposing Plaintiffs' Motion to Vacate is appropriate because Plaintiffs' Motion to Vacate seeks to invalidate an arbitration award entered in favor of PSEG. Plaintiffs' Motion to Vacate also asks the Court to permit Plaintiffs to proceed with certain claims made in this litigation in contravention to PSEG's contractual rights as determined by the arbitrators. If the Court grants PSEG limited intervention, PSEG will be in a position to oppose Plaintiffs' collateral attack on the arbitration

[1] Because PSEG seeks intervention for a limited purposes, it respectfully requests that the Court waive the requirement that PSEG provide a responsive pleading under RCFC 24(c).

award and protect its contractual rights. Absent intervention, PSEG would otherwise be unable to protect its interests in these proceedings because they are not adequately represented by any other party to these proceedings.[2]

**I. INTRODUCTION**

In 1999, PSEG bought the minority interests of Plaintiffs in the Hope Creek and Salem nuclear generating stations. The purchase was made pursuant to certain agreements ("Purchase Agreements" or "PAs") whereby Plaintiffs transferred and surrendered to PSEG any and all interests in the claims relating to the failure of the U.S. Department of Energy ("DOE") to begin removing spent nuclear fuel ("SNF").

Notwithstanding these provisions, Plaintiffs initiated litigation in this Court asserting causes of action they had assigned to PSEG. When Plaintiffs repeatedly refused to dismiss these claims and after the dispute resolution process under the PAs failed to resolve the dispute, PSEG initiated arbitration proceedings pursuant to Section 8.3 of the PAs.

The instant litigation was stayed by order of this Court dated April 12, 2007 "in order to allow for completion of the … binding arbitration" between PSEG and Plaintiffs. (April 12, 2007 Order at 2.) An arbitration hearing was held on May 24, 2007.

On June 20, 2007, the arbitration panel issued an opinion and order ("June 20 Award"). The June 20 Award held that Plaintiffs "assigned the takings claims at issue here to PSEG, and that ACE/Delmarva's initiation of its taking litigation and its refusal to dismiss that litigation breached the PAs." (June 20 Award at 24.)

---

[2] As described below, PSEG commenced suit in New Jersey Superior Court on June 25, 2007 to confirm the arbitration award.



400601641v1

PSEG filed a complaint in the Superior Court of New Jersey, Mercer County, on June 25, 2007 ("PSEG's Complaint"). PSEG's Complaint asks for confirmation of the June 20 Award.

On July 2, 2007, the Superior Court of New Jersey, Mercer County, issued an order to show cause why the June 20 Award should not be confirmed and set a briefing schedule for the parties to respond to the show cause order.

Plaintiffs filed their Motion to Vacate in this Court on July 2, 2007, asking that the Court set aside the June 20 Award and find that PSEG waived its right to enforce its rights under the PAs. Plaintiffs ask that they be able to proceed as if the arbitration never occurred and as if their contracts with PSEG did not exist.

On July 12, 2007, Plaintiffs filed a motion in the state court proceedings asking the court to stay those proceedings in favor of the instant motion. On July 17, 2007, the New Jersey court issued an order permitting Plaintiffs to include their stay arguments in their response to the already issued order to show cause. The New Jersey court set a hearing on the order to show cause for August 9, 2007, but asked to be informed as to the status of these proceedings on August 1, 2007. The New Jersey court declined to hear the stay issue separately or as an initial matter as requested by Plaintiffs.

## II. ARGUMENT

Under RCFC 24(a)(2), intervention shall be granted:

> When the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

RCFC 24(a)(2).

When considering a motion to intervene, "the Court must construe the requirements for intervention in favor of intervention." *Armour of Am. v. United States*, 70 Fed. Cl. 240, 243 (2006) (*citing Am. Maritime Transp., Inc. v. United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989)). RCFC 24(a)(2) is to be construed liberally. "Because Rule 24(a)(2) is triggered when an applicant 'claims an interest' that 'may as a practical matter' be impaired or impeded, a motion to intervene 'is in essence a question of standing,' in that it only requires the movant to make well-plead allegations." *Northrop Grumman Information Tech., Inc. v. United States*, 74 Fed. Cl. 407, 413 (2006) (*quoting United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1291 (D.C. Cir. 1980)).

PSEG meets the standard for intervention, as a matter of right, and the Court should allow PSEG to intervene for the limited purpose of opposing Plaintiffs' Motion to Vacate.

As stated more fully in PSEG's memorandum in opposition to Plaintiffs' Motion to Vacate[3], Plaintiffs' motion asks the Court to set aside the June 20 Award and find that PSEG waived its right to arbitrate. Plaintiffs also ask the Court to allow Plaintiffs to continue to prosecute the claims found by the Panel to have been assigned to PSEG under the PAs.

In such circumstances, PSEG has stated a legally cognizable interest for RCFC 24(a)(2) purposes. *See Northrop*, 74 Fed. Cl. at 414 (granting intervention for a limited purpose and commenting that the "interest" showing necessary for Rule 24(a)(2) "is not a very high barrier … [and that] courts have defined the term liberally to include property or other interests directly affected by any ruling of the trial court, rather than solely applying to disposition of the case as a whole."). It is also clear that Plaintiffs' Motion to Vacate directly threatens PSEG's interests by

[3] PSEG's Opposition to Plaintiffs' Motion to Vacate is attached hereto as Exhibit 1. The accompanying exhibits to PSEG's Opposition are attached hereto as Exhibit 2.

seeking to upset an arbitration award in PSEG's favor and thereby invalidate provisions of the Purchase Agreements. *See Am. Maritime Transp., Inc.*, 870 F.2d at 1561 (Intervention is proper "to protect those interests which are of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment.") (internal citations and quotations omitted) (emphasis in the original). Granting Plaintiffs' Motion to Vacate would have a direct and immediate effect on PSEG's legal rights, and PSEG should be heard on this issue.

PSEG is also not adequately represented by any other party to this litigation. The only party to this litigation aside from Plaintiffs is the United States. The United States is not a party to the PAs, was not a party to the arbitration, and does not stand in the same position as PSEG. The United States cannot adequately represent PSEG's interests. *See Armour*, 70 Fed. Cl. at 245 (granting intervention for a limited purpose and holding that "intervention shall be allowed when 'there is a serious possibility that the absentee's interest may not be adequately represented by any existing party.'") (*quoting Am. Tel. & Tel. Co.*, 642 F.2d at 1293)).

## III. CONCLUSION

For the foregoing reasons, PSEG respectfully requests that the Court grant PSEG the right to intervene for the limited purpose of opposing Plaintiffs' Motion to Vacate. PSEG does not seek to otherwise become a party to these proceedings and asks that the Court limit its intervention to issues relating to the arbitration with Plaintiffs. PSEG also requests that its opposition memorandum, Exhibit 1 hereto, be considered by the Court as PSEG's written opposition to Plaintiffs' Motion to Vacate.

Dated: July 19, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for
PSEG Nuclear, L.L.C. and
Public Service Electric and Gas Company

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

No. 04-0034C, into which has been consolidated No. 04-0036C
(Judge Christine O.C. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DELMARVA POWER & LIGHT COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

OPPOSITION OF THIRD-PARTIES PSEG NUCLEAR LLC AND PUBLIC SERVICE ELECTRIC AND GAS COMPANY TO PLAINTIFFS' MOTION TO VACATE ARBITRATION RULING

---

ALEX D. TOMASZCZUK
Pillsbury Winthrop Shaw Pittman LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7950
(703) 770-7901 (fax)

Counsel of Record for
PSEG Nuclear, L.L.C. and Public
Service Electric and Gas Company

OF COUNSEL:

JAY E. SILBERG
DANIEL S. HERZELD
JACK Y. CHU
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

July 19, 2007

**TABLE OF AUTHORITIES**

*Arthur Pew Constr. Co. v. Lipscomb*,
965 F.2d 1559 (11th Cir. 1992) ....................23

*Board of Educ. of the Borough of Alpha, Warren County v. Alpha Educ. Ass'n*,
918 A.2d 579 (N.J. Sup. Ct. 2006)....................17

*Carey v. Connecticut General Life Ins. Co.*,
93 F. Supp. 2d 165 (D.Conn. 1999)....................9

*Centron Corp. v. United States*,
585 F.2d 982 (Ct. Cl. 1978) ....................22

*Commerce Bank, N.A. v. Dimaria Constr., Inc.*,
692 A.2d 54 (N.J. Super. Ct. App. Div. 1997)....................17

*Data-Stream AS/RS Tech., LLC v. China Int'l Marine Containers, Ltd.*, No. 02 CIV 6530 (JFK), 2003 WL 22519456 (S.D.N.Y. 2003) ....................8

*Ehleiter v. Grapetree Shores, Inc.*,
482 F.3d 207 (3d Cir. 2007).................... *passim*

*Exxon Chem. Co. v. National Labor Relations Bd.*,
386 F.3d 1160 (D.C. Cir. 2004) ....................18

*Flex-Foot, Inc. v. CRP, Inc.*,
238 F.3d 1362 (Fed. Cir. 2001)....................13

*Galaxie Boat Ctr. v. ITT Commercial Fin. Corp.*, No. 96-55175, 1997 U.S. App. LEXIS 14934 (9th Cir. June 19, 1997) ....................8

*Hanford v. United States*,
154 F.App'x 216 (Fed. Cir. 2005) ....................10

*Hardie v. United States*,
134 F.App'x 434 (Fed. Cir. 2005) ....................12

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002)....................18

*In re Lagerstrom*,
300 F. Supp. 538 (S.D. Ill. 1969)....................23

*In re Metric Metals Int'l, Inc.*, No. 80 CV 5414 (HFW), 1981 U.S. Dist. LEXIS 10124 (S.D.N.Y. Nov. 9, 1981) ....................23

*International Union of Operating Engineers v. Flair Builders, Inc.*,
406 U.S. 487 (1972)....................18

*Jackson v. United States*,
10 Cl. Ct. 691 (1986) ....................12

*John Wiley & Sons, Inc. v. Livingston*,
376 U.S. 543 (1964).....17,18

*King v. Gilbert*,
569 F.2d 398 (5th Cir. 1978).....24

*Marie v. Allied Home Mortgage Corp.*,
402 F.3d 1 (1st Cir. 2005).....19

*McKenzie v. Irving Trust Co.*,
323 U.S. 365 (1945).....22

*Metromedia Energy, Inc. v. Enserch Energy Serv.'s, Inc.*,
409 F.3d 574 (3d Cir. 2005).....13

*Microchip Tech., Inc. v. U.S. Philips Corp.*,
367 F.3d 1350 (Fed. Cir. 2004).....18

*Moran v. Paine, Webber, Jackson & Curtis*,
389 F.2d 242 (3d Cir. 1968).....8

*Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n*,
351 F.3d 43 (2d Cir. 2003).....18

*Ontario Power Generation, Inc. v. United States*,
369 F.3d 1298 (Fed. Cir. 2004).....10

*Paradise Enters. Ltd. v. Sapir*,
811 A.2d 516 (N.J. Super. App. Div. 2002).....12

*Portland Gen. Elec. Co. v. United States*,
1 Cl. Ct. 232 (1982).....10,11

*Qualcomm Inc. v. Nokia Corp.*,
466 F.3d 1366 (Fed. Cir. 2006).....21

*Saint John Marine Co. v. United States*,
92 F.3d 39 (2d Cir. 1996).....23

*Segal v. Rochelle*, 382 U.S. 375 (1996).....24

*St. John's Mercy Med.l Ctr. v. Delfino*,
414 F.3d 882 (8th Cir. 2005).....15

*Todd v. United States*,
386 F.3d 1091 (Fed. Cir. 2004).....10

*Transamerica Assurance Corp. v. United States*,
423 F. Supp. 2d 691 (W.D. Ky. 2006).....23

*Trentacost v. City of Passaic*,
743 A.2d 349 (N.J. Super. Ct. App. Div. 2000).....17

*Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.*,
97 F.App'x 462 (5th Cir. 2004).....19

*Turner v. United States*, No. 97-5087, 1997 U.S. App. LEXIS 27957 (Fed. Cir. 1997)...............12

*United States v. Certain Space In the Property Known As the Chimes Building*,
320 F. Supp. 491 (N.D.N.Y. 1969)...............................................................22, 23

*United States v. King*, 395 U.S. 1 (1969)...............................................................10

*United States v. Testan*,
424 U.S. 392 (1976)...............................................................................10

*Wallace v. Buttar*,
378 F.3d 182 (2d Cir. 2004)...............................................................13, 15

Watkins v. AIT Worldwide Logistics, Inc.,
441 F. Supp. 2d 762 (E.D.Va. 2006) ...............................................................15

Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.,
274 F.3d 34 (1st Cir. 2001) ...............................................................16

## U.S. CODE AND STATUTES

9 U.S.C. § 1-16 (2007) (Federal Arbitration Act ("FAA")) ..................................... *passim*

28 U.S.C. § 1491 (2007) (Tucker Act) ...............................................................9,10

31 U.S.C. § 3727 (2007) (Anti-Assignment Act)...............................................22, 24

## OTHER AUTHORITIES

Commercial Rules of the Am. Arbitration Ass'n, Rule 7……………………………21, 22

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 2

II. ARGUMENT ..... 7

A. Plaintiffs Waived The Right To Challenge The Jurisdiction Of The Arbitration Panel ..... 7

B. The Court of Federal Claims Lacks Subject Matter Jurisdiction To Vacate An Arbitration Award Between Private Parties ..... 9

C. Plaintiffs Cite No Grounds That Would Entitle Them To An Order Vacating the Arbitration Award ..... 13

D. The Arbitrators Correctly Concluded That Plaintiffs Assigned Their Claims To PSEG ..... 22

III. CONCLUSION ..... 24

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on July 19, 2007)

| | | |
|---|---|---|
| **DELMARVA POWER & LIGHT CO.,** <br> **and** , <br> **ATLANTIC CITY ELECTRIC CO.** <br> Plaintiffs, <br> v. <br> **THE UNITED STATES,** <br> Defendant. | ) | Nos. 04-34C & 04-36C <br> (Judge Christine O.C. Miller) |

**OPPOSITION OF THIRD-PARTIES PSEG NUCLEAR LLC AND PUBLIC SERVICE ELECTRIC AND GAS COMPANY TO PLAINTIFFS' MOTION TO VACATE ARBITRATION RULING**

PSEG Nuclear, LLC and Public Service Electric and Gas Company (collectively "PSEG"), by and through the undersigned counsel, submit their opposition to the Motion to Vacate Arbitration Ruling ("Motion to Vacate") filed by Plaintiffs Delmarva Power and Light Company and Atlantic City Electric Company (collectively "Plaintiffs"). Plaintiffs' Motion to Vacate is an impermissible attempt to escape a binding arbitration award that resolved a question that Plaintiffs themselves submitted to the arbitration Panel for decision. Plaintiffs have not only waived their right to request such relief, they make such a request in a court that is without subject matter jurisdiction to entertain the Motion to Vacate. In addition, the motion cites no grounds for granting relief under the Federal Arbitration Act, which defines the circumstances upon which an arbitration award may be vacated. Finally, Plaintiffs are simply wrong both in their characterization of the law governing the appropriate forum to determine waiver/delay

claims and in their effort to attack the arbitrators' underlying decision on the assignability of Plaintiffs' takings claims. None of Plaintiffs' arguments withstands scrutiny, and their Motion to Vacate should accordingly be denied.

## I. INTRODUCTION

PSEG is the operator and sole owner of the Hope Creek nuclear power station and the operator and majority owner of the Salem nuclear power station.[1] In 1999, PSEG bought the minority interests of Plaintiffs in the Hope Creek and Salem nuclear power stations. To carry out those transactions, Plaintiffs executed detailed agreements ("Purchase Agreements" or "PAs") whereby Plaintiffs transferred and surrendered to PSEG any and all interests in the claims relating to the failure of the U.S. Department of Energy ("DOE") to begin removing spent nuclear fuel ("SNF"). Plaintiffs also agreed that PSEG had all associated rights of recovery for such actions and the right to control all litigation related thereto. *See generally*, PAs Sections 2.1(l),(m), 2.5, 2.6 and 6.8.

Notwithstanding these provisions, Plaintiffs commenced the instant litigation (the "Delmarva Litigation") based wholly on claims that they were injured by DOE's failure to commence removal of SNF. Because Plaintiffs refused to accede to PSEG's repeated demands to dismiss this litigation, PSEG invoked the disputes procedures in Section 8.3 of the Purchase Agreements (Exhibit A) providing for binding arbitration.

---

[1] PSEG Nuclear LLC is the operator and sole owner of the Hope Creek Nuclear Generating Station ("Hope Creek") and the operator and majority owner of the Salem Nuclear Generating Station ("Salem"). PSEG Power LLC, the parent company of PSEG Nuclear LLC, was the original purchasing entity under the PAs.

Pursuant to Section 8.3, PSEG sent a notice of dispute to Plaintiffs on January 31, 2007 ("January 31 Letter") (Exhibit B) outlining the dispute and proposing a meeting between party executives on March 16, 2007. By letter dated February 22, 2007 ("February 22 Letter") (Exhibit C), Plaintiffs replied to the January 31 Letter and supplemented that letter on March 15, 2007 ("March 15 Letter") (Exhibit D). The March 15 letter was Plaintiffs' own notice of dispute to PSEG under Section 8.3. It described Plaintiffs' dispute with PSEG as being whether PSEG's notice of dispute was valid and whether PSEG is precluded from arbitrating the dispute as a result of alleged delay in bringing its arbitration demand.[2] A meeting between authorized executives for each party was held on March 16, 2007. No resolution to the dispute was reached at that meeting.

PSEG served its Arbitration Demand on April 5, 2007, seeking a declaration that Plaintiffs assigned to PSEG all claims that relate to DOE's failure to take SNF from Salem and Hope Creek, that PSEG holds the right to control any litigation involving the Purchased Assets (including "takings" claims related to DOE's failure to take SNF), and that Plaintiffs are required to dismiss the Delmarva Litigation at PSEG's request.

In response, Plaintiffs filed their own Arbitration Demand on April 16, 2007 (Exhibit E) which was superseded by an Amended Arbitration Demand filed on April 23, 2007 (Exhibit F). In both demands, Plaintiffs put into arbitration the very claim that they now say could not be heard in arbitration: that PSEG's notice of dispute and Arbitration Demand were invalid because PSEG allegedly waived its right to arbitrate and was barred by laches and estoppel. Plaintiffs'

[2] Plaintiffs also contended that this Court had already ruled upon the assignability of Plaintiffs' claims.

Amended Arbitration Demand repeated the same issues and also submitted to arbitration the question of whether PSEG's claims were beyond the scope of the arbitration provision. In neither their initial nor amended Arbitration Demands did Plaintiffs contest the authority of the Panel to determine any of the claims contained in Plaintiffs' Arbitration Demand – including claims related to waiver and alleged delay.

The arbitration Panel convened a preliminary arbitration hearing on May 9, 2007 ("May 9 Hearing"). At that hearing, Plaintiffs argued, contrary to all of their prior letters and Arbitration Demands, that the Panel lacked jurisdiction to hear Plaintiffs' claims that PSEG should be estopped or otherwise waived its rights through delay. Plaintiffs made this assertion despite the fact that they acknowledged in pleadings before this Court that they had in fact submitted to arbitration the very issues they maintained the arbitration Panel was incompetent to decide. *See* Plaintiffs' Supplemental Brief Requested by the Court's March 27, 2007 Order to Show Cause, April 6, 2007 at 1 ("Plaintiffs have squarely placed in issue, in the arbitration between Plaintiffs and [PSEG], PSEG's significant, unexcused delay in seeking arbitration and believe that the panel will consider it forthwith."). At the May 9 Hearing, Plaintiffs also requested that the arbitration panel bifurcate the arbitration proceedings to determine first the issue of whether PSEG was barred from arbitration on the grounds of laches or estoppel, or otherwise waived its right to arbitrate, and to determine whether the arbitrators or the Court were the appropriate body to resolve the delay-related question. The second part of the proceeding, if necessary, would address the merits of PSEG's claims.

The arbitration Panel granted a modified form of Plaintiffs' request and issued a scheduling order on May 9, 2007 that required the parties to file separate briefs on the question

of arbitrability, the appropriate body to determine arbitrability, and whether PSEG was barred from arbitration on the grounds of waiver/delay. (May 9, 2007 Scheduling Order at 1.)[3] Initial briefs on these issues were to be filed on May 15, 2007, with responsive briefs filed on May 17, 2007. The scheduling order also indicated that the Panel would make a preliminary determination as to whether the case should move forward after considering the briefs of the parties. If the arbitrators decided the case should move forward, additional briefs addressing the merits of the parties' claims would be filed on May 21, 2007, with replies filed on May 23, 2007. A hearing on all issues briefed by the parties would then be held on May 24, 2007.[4]

The arbitrators determined that the case should move forward after receiving and considering the parties' first briefs and supporting documents and affidavits on May 15 and May 17, 2007. Per the May 9 scheduling order, the parties submitted additional briefs and supporting documents and affidavits on May 21 and May 23, 2007. A five-hour hearing was held on May 24, 2007, during which time, in addition to hearing oral argument, the Panel received additional documentary evidence that was introduced from Plaintiffs.

On June 20, 2007, the arbitration panel issued an opinion and order ("June 20 Award"). The Panel first ruled that it had jurisdiction to hear Plaintiffs' claims of waiver, laches, and

---

[3] The May 9, 2007 Scheduling Order is attached as Exhibit 4 to Plaintiffs' Motion to Vacate.

[4] While Plaintiffs suggest in their Motion to Vacate that this briefing schedule was somehow unfair and did not provide enough time to consider the issues, the schedule is completely consistent with the arbitration agreement at issue that provides that the arbitration must commence within 60 days of the dispute resolution meeting that was held on March 16, 2007. PAs Section 8.3. Moreover, Plaintiffs agreed at the May 9 Hearing that the schedule was acceptable. Contrary to Plaintiffs' suggestion, the arbitration Panel gave no indication that it intended to issue a written opinion or order on the preliminary questions regarding arbitrability.

delay. The Panel then rejected those claims. (June 20 Award at 12-17.)[5] The Panel further determined that Plaintiffs "assigned the takings claims at issue here to PSEG, and that ACE/Delmarva's initiation of its taking litigation and its refusal to dismiss that litigation breached the PAs." (June 20 Award at 24.)

Pursuant to Section 10.10 of the PAs (Exhibit G), which provides that venue and exclusive jurisdiction for "any and all suits … related to the subject matter of this Agreement shall be in the state and federal courts located in and for the State of New Jersey," PSEG filed a verified complaint in the Superior Court of New Jersey, Mercer County, on June 25, 2007 ("PSEG's Complaint"). PSEG's complaint asks for confirmation of the June 20 Award.

On July 2, 2007, the Superior Court of New Jersey issued an order to show cause (Exhibit H) why the June 20 Award should not be confirmed and set a briefing schedule for the parties to respond to the show cause order. Although Plaintiffs' counsel was provided a copy of PSEG's Complaint on June 25, 2007, Plaintiffs filed the instant Motion to Vacate on July 2, 2007, claiming that only this Court could intervene and set aside the June 20 Award. The Motion to Vacate fails to make any reference to the pending New Jersey state court proceedings.

On July 12, 2007, Plaintiffs filed a motion in the state court proceedings asking that court to stay those proceedings in favor of the instant motion. On July 17, 2007, the Superior Court of New Jersey issued an order permitting Plaintiffs to include their stay arguments in their response to the order to show cause why the award should not be confirmed. The New Jersey Court set a hearing on the order to show cause for August 9, 2007, but asked to be informed as to the status

---

5 The June 20 Award is attached as Exhibit 1 to Plaintiffs' Motion to Vacate.

of these proceedings on August 1, 2007. The New Jersey court declined to hear the stay issue separately or as an initial matter as requested by Plaintiffs.

## II. ARGUMENT

### A. Plaintiffs Waived The Right To Challenge The Jurisdiction Of The Arbitration Panel

Plaintiffs' Motion to Vacate suggests that Plaintiffs were forced to arbitrate their claims that PSEG lost its right to arbitrate as a result of its alleged delay. (Motion to Vacate at 5-7.) Exactly the contrary is true. First, Plaintiffs were contractually bound to arbitrate their dispute with PSEG under the clear dictates of Section 8.3 of the PAs (as recognized by this Court in its March 27, 2007 Show Cause Order at 4.) Second, Plaintiffs further consented to the arbitration of their waiver/delay claims by themselves submitting those very issues to be resolved in arbitration. At the May 9 Hearing, Plaintiffs also asked the Panel to rule upon the issue of whether waiver should be resolved in arbitration or in court. This conduct constitutes a clear contradiction of Plaintiffs' position in their Motion to Vacate that the arbitration should not have occurred.

Plaintiffs' waiver of the right to object now to the Panel's jurisdiction is manifested in many ways:

- Plaintiffs failed to raise the issue of the arbitration Panel's jurisdiction in proceedings before this Court prior to arbitration and failed to initiate an appropriate action in New Jersey resisting arbitration. Indeed, Plaintiffs argued exactly the contrary to this Court: stating that they had submitted their delay claims to the Panel and expected the Panel to decide them forthwith. *See* Plaintiffs' Supplemental Brief Requested by the Court's March 27, 2007 Order to Show Cause, April 6, 2007 at 1.

- Plaintiffs participated extensively in the dispute resolution process under Section 8.3 without any jurisdictional objection to arbitration. *See* letter of February 22, 2007 from Thomas Shaw to Frank Cassidy and March 15 Notice of Dispute from Thomas Shaw to Frank Cassidy. (Exhibits C and D hereto). Under Section 8.3 of the PAs, the

February 22 letter and the March 15 Notice required Plaintiffs to detail their arguments in response to PSEG's claims and to detail the facts and arguments in support of their own claims.

- Plaintiffs' March 15 notice of dispute put the waiver/delay issue squarely into the dispute resolution process, which leads to "final, binding and conclusive" arbitration. PAs Section 8.3.
- Plaintiffs served two arbitration demands raising the very waiver/delay issues that they now claim the Panel was incompetent to hear.
- Plaintiffs appointed a party-arbitrator, participated in the appointment of a neutral arbitrator, drafted a supplemental agreement governing the arbitration and served discovery on PSEG in arbitration. *See* Supplemental Arbitration Agreement and ACE/Delmarva First Set of Interrogatories to PSEG attached hereto as Exhibits I and J respectively.
- In a letter to the Panel dated April 28, 2007, Plaintiffs urged the Panel to hear their claims related to arbitrability (including waiver and delay) in advance of hearing PSEG's claims. Plaintiffs made no objection to the Panel's considering their claims. *See* April 28, 2007 Letter from Frederick Lowther to Panel, attached as Exhibit 3 to Plaintiffs Motion to Vacate.
- At the May 9 Hearing, Plaintiffs, for the first time, raised a question of whether the Panel or the Court should determine the waiver/delay claim; however, Plaintiffs urged the Panel to consider and resolve that question.

By submitting the very issues to arbitration that Plaintiffs now claim the Court should have resolved, Plaintiffs may not now be heard to claim that the arbitration should be set aside on jurisdictional grounds. *See Galaxie Boat Center v. ITT Commercial Finance Corp.*, No. 96-55175, 1997 U.S. App. LEXIS 14934, at *4 (9th Cir. June 19, 1997) ("A party that agrees to submit the question of arbitrability to an arbitrator waives any right to object to that arbitrator's authority later.") (internal citations omitted). *See also Moran v. Paine, Webber, Jackson & Curtis*, 389 F.2d 242, 246 (3d Cir. 1968) (by voluntarily submitting her claim to arbitration in which a valid award was rendered, the appellant waived her right to litigate those claims); *Data-Stream AS/RS Tech., LLC v. China Int'l Marine Containers, Ltd.*, No. 02 Civ. 6530(JFK), 2003 WL 22519456, at * 3 (S.D.N.Y. Nov. 6, 2003) (Noting that if CIMC felt that it should not have

been a party to the arbitration, it should have refused to arbitrate and forced the opposing party to move the district court to compel arbitration; "[b]y actively participating and waiting until an award has been entered against it to complain to a district court, CIMC is essentially seeking a second bite at the apple."); *Carey v. Connecticut Gen. Life Ins. Co*., 93 F. Supp. 2d 165, 169 (D.Conn. 1999) (Holding that Carey could not object to the arbitration after she herself had submitted the dispute to arbitration).

Plaintiffs' acts, individually and cumulatively, require Plaintiffs to abide by their decision to arbitrate their waiver/delay-related claims and preclude this collateral attack on a concluded arbitration. To hold to the contrary would allow Plaintiffs to submit claims to arbitration, participate without objection in the entire arbitration process, and then ask for the whole process to be repeated in court if they did not like the result.

**B. The Court of Federal Claims Lacks Subject Matter Jurisdiction To Vacate An Arbitration Award Between Private Parties**

Plaintiffs have not only waived their right to contest the arbitrability of their waiver/delay-related claims; they have brought their challenge in a court whose subject matter jurisdiction does not reach the relief that Plaintiffs seeks.

It is well settled that the United States Court of Federal Claims is a court of limited jurisdiction whose authority is defined by the Tucker Act, 28 U.S.C. § 1491 (2007). The Tucker Act provides in relevant part that:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

The jurisdictional constraints outlined in the Tucker Act have been strictly construed by judicial decisions that have interpreted the statute. Those decisions affirm what is plain on the face of statute itself: this Court's jurisdiction is limited to monetary claims against the United States. *See United States v. Testan*, 424 U.S. 392, 397-98 (1976) ("the Court of Claims was established by Congress in 1855; [and] that 'throughout its entire history … its jurisdiction has been limited to money claims against the United States Government …..'") (quoting *United States v. King*, 395 U.S. 1, 2-3 (1969)); *Todd et al. v. United States*, 386 F.3d 1091, 1093 (Fed. Cir. 2004) (affirming dismissal of appellants' claims because "[t]he jurisdiction of the Court of Federal Claims under the Tucker Act is 'limited to actual, presently due money damages from the United States.'") (quoting *Testan*, 424 U.S. at 398)); *Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1303 (Fed. Cir. 2004) (holding that "jurisdiction under the Tucker Act is lacking" because the statute pursuant to which relief was sought did not create a "money-mandating" claim against the United States); *Hanford v. United States*, 154 F. App'x 216 (Fed. Cir. 2005) ("The jurisdictional statutes governing the United States Court of Federal Claims only grant authority to that court to issue judgments for money against the United States, provided that the claims are grounded in a contract or arise pursuant to a money-mandating statute, regulation, or provision of the constitution."), *cert. denied*, 127 S. Ct. 2045 (2007).

Because Plaintiffs' Motion to Vacate does not state a claim for monetary relief against the United States, it does not fall within the jurisdictional strictures of the Tucker Act. Accordingly, the Court lacks jurisdiction to hear Plaintiffs' motion. *See Portland Gen. Elec. Co. v. United States*, 1 Cl. Ct. 232, 234 (1982) (request by plaintiff to modify or vacate an arbitration award did not state "claim to money damages against the United States within the purview of

Section 1491 …. Accordingly, and on the latter ground alone, defendant's argument of lack of jurisdiction is upheld.").

In *Portland*, plaintiff, a utility company, was a party to a contract related to hydro-electric power with the Confederated Tribes of the Warm Springs Reservation of the Oregon Tribes (the "Tribes"). *Id.* at 232-233. The contract, to which the United States was not a party, contained an arbitration provision. When a dispute over payment terms arose under the contract, an arbitration was held and an award resolving the dispute was entered. The utility objected to the award and filed a petition to vacate or modify the award in the United States Claims Court, alleging that jurisdiction was proper because the United States was trustee for the Tribes and held approval rights over the contract sued upon. The court dismissed the petition, finding that irrespective of the United States' status as trustee and regardless of whether any claim against the United States had been stated, the petition to vacate or modify the award did not state a claim for monetary relief against the United States and therefore jurisdiction could not lie in the United States Claims Court. *Id.* at 233-234.

In *Portland*, as here, the United States is not a party to the arbitration agreement, and Plaintiffs' request for relief does not state a claim for monetary relief within the Tucker Act.

Moreover, the arbitration agreement between the parties is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1-16 (2007) et seq.[6] Under the FAA, federal court jurisdiction to vacate arbitration awards rests exclusively in the district courts, and such matters

[6] The Federal Arbitration Act is applicable because the PAs are contracts involving interstate commerce. 9 U.S.C. § 2 (2007).

cannot be heard in this Court. *See* 9 U.S.C. § 10 (2007) ("the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration …"); *Turner v. United States*, No. 97-5087, 1997 U.S. App. LEXIS 27957, at * 5 (Fed. Cir. Oct. 9, 1997) ("the Court of Federal Claims does not have jurisdiction to hear claims of wrongdoing by arbitrators, because jurisdiction over such claims is vested in the district courts under 9 U.S.C. § 10."); *Jackson v. United States*, 10 Cl. Ct. 691, 694 (1986) ("to the extent that the instant action may be grounded on 9 U.S.C. § 10, the court finds that it does not provide a jurisdictional basis for Claims Court review.").

Plaintiffs' contention that this Court has jurisdiction to vacate the June 20 Award is even less compelling than the arguments in *Turner* and *Jackson*. In those decisions, the relief sought at least implicated arbitrations involving the United States. Here, Plaintiffs seek to invoke this Court's jurisdiction over a contractual dispute that is strictly between two private parties.

Additionally, the PAs at issue include a forum selection clause wherein the parties consented to the exclusive jurisdiction and venue of the Federal and state courts of New Jersey for any and all suits "related to the subject matter" of the PAs. PAs Sec. 10.10. Such forum selection clauses are enforceable under the FAA, and the Court should not countenance Plaintiffs' breach of their contractual obligations. *See Hardie v. United States.*, 134 CF. App'x 434, 435 (Fed. Cir. 2005) ("the FAA allows a party to seek relief to confirm an award in the court specified in the agreement [] or, if no court is specified in the agreement, in the appropriate United States District Court."). Even if the Court had subject matter jurisdiction to hear Plaintiffs' Motion to Vacate, Plaintiffs are bound by the forum selection clause in the PAs and must litigate the validity of the arbitration award in New Jersey. *Paradise Enters. Ltd. v. Sapir*,

811 A.2d 516, 520-21 (N.J. Super. Ct. App. Div. 2002) (forum selection clauses are "prima facie valid and enforceable in New Jersey") (internal quotation and citation omitted).

Finally, PSEG has already initiated court proceedings in the Superior Court for New Jersey to enforce the arbitration award (the only forum available to PSEG under the FAA and the PAs). Plaintiffs have an appropriate forum to address their challenges to the arbitration in those proceedings. Hearing Plaintiffs' Motion to Vacate in this Court would waste judicial resources and give rise to the danger of inconsistent results.

For each of these reasons the Court should conclude that it lacks jurisdiction to hear Plaintiffs' Motion to Vacate.

### C. Plaintiffs Cite No Grounds That Would Entitle Them To An Order Vacating the Arbitration Award

Even if this Court had the authority to hear Plaintiffs' Motion to Vacate, the motion should also be denied because Plaintiffs cite no appropriate grounds to vacate an award under the FAA.

Judicial review of arbitration awards under the FAA is extremely limited. *Metromedia Energy, Inc. v. Enserch Energy Serv.'s, Inc.*, 409 F.3d 574, 578 (3d Cir. 2005) ("Review of arbitration awards under the FAA is extremely deferential.") (internal quotation and citation omitted), *cert. denied*, 126 S. Ct. 1021 (2006); *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1367 (Fed. Cir. 2001) ("[T]he Arbitration Act sets forth that the decision of the arbitration panel is entitled to great deference by the district court.") (internal citation omitted). Accordingly, under section 10 of the FAA, the circumstances in which a court has the power to vacate an arbitration award are "exceedingly narrow." *Metromedia Energy, Inc.*, 409 F.3d at 578; *see also Wallace v.*

*Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) ("A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law.") (internal quotation and citation omitted); 9 U.S.C. § 10.

Section 10 of the FAA provides four grounds upon which a court may vacate an arbitration award:

> (1) Where the award was procured by corruption, fraud, or undue means. (2) Where there was evident partiality or corruption in the arbitrators, or either of them. (3) Where the arbitrators are guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced. (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id.*[7]

Plaintiffs' Motion to Vacate does not allege a single ground under Section 10 of the FAA that would allow any court to vacate the June 20 Award. Plaintiffs do not allege corruption, fraud, partiality, or misconduct by the arbitrators. Plaintiffs also do not argue that the arbitrators exceeded their authority by ruling upon Plaintiffs' waiver/delay-related claims – which Plaintiffs themselves had submitted to the Panel.

Instead, Plaintiffs appear only to contend that (1) under *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207 (3d Cir. 2007) the question of delay/waiver should have been decided by this Court and that this Court should reassert jurisdiction to decide Plaintiffs' delay-related claims;

---

[7] Although the FAA is applicable, the standard for vacating an arbitration award under New Jersey law is nearly identical to Section 10 of the FAA. *See* NJ Stat § 2A:23B-23.

and (2) the arbitrators erred in allegedly misapplying *Ehleiter*. (Motion to Vacate at 9-10, 11.) Neither of these alleged deficiencies are a basis for vacating the arbitration award.

Plaintiffs' first contention – that the Court should simply supplant the decision of the arbitrators and substitute its own judgment for that of the Panel - would violate a fundamental premise of arbitration jurisprudence. *See St. John's Mercy Med. Ctr. v. Delfino*, 414 F.3d 882, 885 (8th Cir. 2005) (holding that the "district court erred in substituting its remedial judgment for that of the arbitrator."); *Watkins v. AIT Worldwide Logistics, Inc.*, 441 F. Supp. 2d 762, 768 (E.D.Va. 2006) ("[T]his court will not substitute [its] judgment for that of the arbitrator, absent a showing of a proper ground for vacatur.") (internal quotation and citation omitted).

Plaintiffs' second contention – that the Panel erred in its application of *Ehleiter* - is not a challenge to the authority of the Panel to make such a decision but merely a claim that the Panel's interpretation of that case was wrong. Where the grounds for a motion to vacate are that the arbitration panel arrived at an incorrect legal conclusion, even a court with jurisdiction to review the arbitration award must give such legal conclusions great deference and may only overturn them if the arbitrators manifestly disregarded the law. *Wallace*, 378 F.3d at 189. However, "manifest disregard of the law" is a "severely limited doctrine," and courts "cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law. On the contrary, the award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." *Id.* at 189-90 (internal quotations and citations omitted). *See also St. John's Mercy Med. Ctr.*, 414 F.3d at 884 (holding that "manifest disregard of the law" is an "extremely narrow" doctrine and that the party asserting its application "bears the burden of proving that the arbitrators were fully

aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it"); *Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.*, 274 F.3d 34, 35-36 (1st Cir. 2001) (explaining that judicial review of an arbitrator's decision is "extremely narrow and exceedingly deferential" and that an arbitral award is only in manifest disregard of the law if **"**the award is contrary to the plain language of the contract, or it is clear from the record that the arbitrator recognized the applicable law, but ignored it.") (internal quotations and citations omitted).

Here, the Panel's decision to decline to find that *Ehleiter* mandated court-resolution of the waiver/delay-related claims is more than colorable; it is correct both under state and Federal law.

The court in *Ehleiter* described the "typical waiver case" as one in which a party opposed arbitration on the grounds of his opponent's having "actively participat[ed] in the underlying proceedings before that court." *Ehleiter*, 482 F.3d at 220. In that case, Ehleiter, filed a complaint against Grapetree Shores, Inc. ("GSI"). GSI answered the complaint and over the next four years participated extensively in discovery by serving and answering interrogatories and document requests, taking depositions and serving expert reports. Additionally, GSI filed a stipulation certifying that it was ready for trial. After a failed mediation attempt, Ehleiter requested a trial date from the court. GSI sought a brief continuance and a new trial date was set. Thereafter, GSI filed a motion for summary judgment, and a motion to implead a third-party defendant. On the final day of motions practice under the scheduling order in place, and the day before pre-trial statements and jury instructions were due, GSI moved to stay the case in favor of arbitration. *Id.* at 210. The stay was denied for the reason that GSI had waived its right to

arbitrate by actively participating in the underlying litigation. This decision was appealed, and the Third Circuit affirmed finding that the trial-court and not an arbitration panel was "presumptively" the proper body to determine waiver allegations based on litigation conduct occurring before it. *Id.* at 210-211.

As an initial matter, Plaintiffs incorrectly contend that *Ehleiter* controls because it is a Third Circuit decision applicable to the arbitration proceedings subject to New Jersey law. (Motion to Vacate at 5 n. 9.) However, *Ehleiter* in fact arose out of a decision from a court in the Virgin Islands. There is no suggestion that it was applying New Jersey law. New Jersey law holds that procedural defenses to arbitrability, such as those alleged by Plaintiffs, are reserved for the arbitrators. *See, e.g., Bd. of Educ. of the Borough of Alpha, Warren County v. Alpha Educ. Ass'n*, 918 A.2d 579, 584 (N.J. Sup. Ct. 2006) (matters of procedural arbitrability "should be left to the arbitrator"); *Trentacost v. City of Passaic*, 743 A.2d 349, 352 (N.J. Super. Ct. App. Div. 2000) ("all procedural matters, including the application and effect of contractual periods of limitations and the fulfillment . . . of conditions precedent to arbitration, should be decided by the arbitrators"); *Commerce Bank v. Dimaria Constr., Inc.*, 692 A.2d 54, 57-59 (N.J. Super. Ct. App. Div. 1997) (holding that the timeliness of the arbitration demand was for the arbitrators to determine).

New Jersey law also conforms to Federal law on this point. Under the FAA, the Supreme Court has carefully crafted the limited circumstances in which judicial intervention into the arbitral process is permitted. In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964), the Supreme Court distinguished the threshold issues of arbitrability (scope and formation of the arbitration clause) from procedural questions related to the arbitration. The *Wiley* court held that

"[o]nce it is determined … that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *Id.* at 557. The Court in *International Union of Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 490-91 (1972), subsequently held that the arbitrators and not the court should decide the question of whether a delay in noticing an arbitration constituted laches that would bar the right to arbitrate.

In *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), the Court expanded on the holdings of *Wiley* and *Flair Builders* and outlined the categories of disputes that are presumptively for a court to decide and those that are presumptively for the arbitrators. *Howsam* concluded that parties to an arbitration provision contracted to have the arbitrators resolve "procedural questions which grow out of the dispute and bear on its final disposition . . . . [such as] allegations of waiver, delay, or a like defense to arbitrability." *Id.* at 84. These questions are presumptively for the arbitrator and not the courts. *Id.*

In the years following *Howsam*, the vast majority of courts that have considered its holding have agreed that allegations of waiver and delay are procedural defenses that are presumptively for the arbitrator – not the court. *See, e.g.*, *Microchip Tech., Inc. v. U.S. Philips Corp.*, 367 F.3d 1350, 1359 n.7 (Fed. Cir. 2004) ("We note that the Supreme Court has stated that the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability."); *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n*, 351 F.3d 43, 46 (2d Cir. 2003) (allegation of repudiation of arbitration agreement "most closely resembles the defenses to arbitrability such as waiver, estoppel, or delay that the Supreme Court listed as questions properly decided by arbitrators"); *Exxon Chem. Co. v. Nat'l Labor Relations Bd.*, 386

F.3d 1160, 1166 (D.C. Cir. 2004) ("Exxon's objections that the three grievances were untimely under the contract, and its claims of waiver and estoppel … are properly for the arbitrator to resolve [sic].").

The only exceptions to *Howsam* and its progeny are a few cases where courts have concluded that waiver based on conduct before the court remains presumptively an issue for the court to decide. *See, e.g.*, *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207 (3d Cir. 2007); *Marie v. Allied Home Mortgage Corp*., 402 F.3d 1, 35 (1st Cir. 2005). These cases hold that the courts are in the best position to assess whether a party has in fact waived its right to arbitrate based on the party's conduct before that very court. *See also Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.*, 97 F. App'x 462, 463-64 (5th Cir. 2004). It is clear, however, that these decisions are limited to waiver due to extensive participation, as a party, in litigation proceedings and do not address waiver, laches, or estoppel based on delay or acquiescence.

PSEG has not "actively participated" in the instant proceedings, and the facts here do not remotely resemble the facts in *Ehleiter*. PSEG opposed every effort to consolidate its case with the case at bar, and PSEG's participation in this case has been limited to opposing a third-party subpoena imposed on it and filing an April 2007 memorandum supporting the arbitration process already underway. That memorandum was served after the Court directed that its March 27, 2007 Show Cause Order be served on PSEG. PSEG is not a party to this suit. Although Plaintiffs now contend in their Motion to Vacate that consolidation may be appropriate, Plaintiffs have previously opposed every effort of the United States to bring PSEG into this suit as a party

through consolidation. The facts here hardly rise to the level of "active participation" in litigation of a type found in *Ehleiter*.[8]

The arbitrators properly found the reasoning in *Ehleiter* to be inapplicable to this dispute. June 20 Award at 11-12. The arbitrators noted that *Ehleiter* and the cases cited therein involved parties litigating against each other before the same court; whereas, in this case, the parties have not been litigating the merits of their cases before the same judge. June 20 Award at 11. In fact, as the arbitrators pointed out, "ACE/Delmarva has opposed DOE's consolidation motions that would have put both parties before the same Judge." The arbitrators therefore felt that "in a case, such as this, in which both parties have submitted the issue to arbitration and there is no single court before which both parties' litigation conduct took place," no court was in a better position than they to determine whether PSEG had waived its arbitration rights through its litigation conduct. *Id.* at 12. This conclusion by the Panel is entitled to deference under the above-referenced standards for vacating arbitration awards. It may not simply be disregarded because Plaintiffs disagree with it.

Furthermore, as Plaintiffs concede, *Ehleiter* states only a "presumption" in favor of a court determining arbitrability; it is not a jurisdictional ruling. *Ehleiter* does not stand for the proposition that an arbitration panel is incompetent to determine litigation-related waiver

---

[8] Plaintiffs' suggestion that responding to a third-party document subpoena and producing deponents in response to third-party deposition subpoenas is analogous to the conduct of GSI in the *Ehleiter* decision is so far from the mark that it justifies little discussion. So is Plaintiffs' suggestion that PSEG's awareness of this case and pursuit of its own case somehow resemble the type of conduct present in *Ehleiter.* As the Court is well aware, PSEG resisted, in good faith, what it considered to be over-reaching discovery served on it – a non-party. Plaintiffs' contention that this was an effort to delay the Delmarva Litigation is purely a conclusory statement and bears no relation to the conduct discussed in *Ehleiter*.

questions. In fact, the issue addressed in *Ehleiter* was whether a court, not the arbitrators, should make such a determination in light of the overwhelming authority in favor of arbitral resolution of delay-related claims. *Ehleiter* carved out a limited exception for court resolution where there was litigation conduct nowhere present here. If the Court were to hear Plaintiffs' motion and find that the arbitrators were not competent to resolve allegations of waiver, it would be reversing years of arbitration jurisprudence to the contrary.

The posture of *Ehleiter* is also worth considering. In *Ehleiter*, the court made a determination that the right to arbitration had been waived when GSI moved to stay litigation in favor of arbitration on the eve of trial. Unlike the present case, in *Ehleiter* no arbitration ever took place and the party resisting arbitration did not submit the waiver issue in question to arbitration as Plaintiffs have done here.

Finally, there is nothing in *Ehleiter* to indicate that the parties there had adopted the Commercial Rules of the American Arbitration Association ("AAA Rules"), as did the parties here in Section 8.3 of the PAs. The AAA Rules confer jurisdiction on the Panel to resolve questions related to arbitrability. *See* AAA Rules, R. 7 ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.") *See also Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1372-73 (Fed. Cir. 2006) (holding that because the parties' agreement incorporates the AAA rules and the AAA rules provide that an arbitration panel has the power to rule on its own jurisdiction, the "clear and unmistakable intent" of the parties was to "delegate the issue of determining arbitrability" to the arbitrators).

Rule 7 gave the arbitrators, and not the court, the ability to decide the delay issue. The AAA Rules alone are dispositive of Plaintiffs' late-arising effort to avoid the arbitrators' finding of jurisdiction.

### D. The Arbitrators Correctly Concluded That Plaintiffs Assigned Their Claims To PSEG

While Plaintiffs contend that they are not challenging the substance of the arbitration award, (Motion to Vacate at 1), Plaintiffs go to great lengths to argue the merits. A brief reply shows that their position has no merit.

Plaintiffs rely on the Anti-Assignment Act (also commonly referred to as the Assignment of Claims Act), 31 U.S.C. § 3727 (2007), to argue that they could not have assigned their takings claims to PSEG because such claims are unassignable as a matter of law under the Act. Plaintiffs' reliance on the Anti-Assignment Act is misplaced.

The Anti-Assignment Act was adopted exclusively for the benefit and protection of the government; it does not determine the rights as between private parties. Plaintiffs may not rely on it. *See United States v. Certain Space In the Property Known As the Chimes Bldg.*, 320 F. Supp. 491, 496 (N.D.N.Y. 1969) ("The Anti-Assignment Act is for the government's protection and only the United States may assert it."), a*ff'd*, 435 F.2d 872 (2d Cir. 1970); *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369 (1945) ("The provisions of the statute governing assignments of claims against the Government are for the protection of the Government and not for the regulation of the equities of the claimants as between themselves."); *Centron Corp. v. United States*, 585 F.2d 982, 986 n. 3 (Ct. Cl. 1978) ("The Act … does not invalidate any contractual rights or equities as between the private parties to an assignment that does not satisfy

the Act.") (internal citations omitted); *Arthur Pew Constr. Co. v. Lipscomb*, 965 F.2d 1559, 1576 (11th Cir. 1992) ( "The assignment statutes are for the protection of the government. They do not regulate the rights of parties to an assignment . . . [and] [w]hether or not an assignment is valid as against the United States, it is effective and binding on the parties.") (internal citation omitted); *Saint John Marine Co. v. United States*, 92 F.3d 39, 45 (2d Cir. 1996) (assignment voided by the Anti-Assignment Act "remains enforceable as between the parties to the assignment") (internal citations omitted); *Transamerica Assurance Corp. v. United States*, 423 F. Supp. 2d 691, 695 n.2 (W.D. Ky. 2006) ("The Act, however, does not affect the rights of parties to an assignment.") (internal citation omitted), *aff'd*, 2007 WL 1595805 (6th Cir. June 5, 2007).

Plaintiffs have been unable, either in arbitration or before this Court, to identify a single case where a private party asserted the Anti-Assignment Act to invalidate its contractual obligations to another private party. They have not done so because the law is to the contrary. *See Certain Space In the Property Known As the Chimes Bldg.*, 320 F. Supp. at 496 (Upholding an assignment between the private parties because "SID's assertion that the assignment is void is without merit. The Anti-Assignment Act is for the government's protection and only the United States may assert it."), *In re Lagerstrom*, 300 F. Supp. 538, 540 (S.D. Ill. 1969) (Upholding the assignment between the private parties because the Assignment of Claims Act "is meant for the protection of the United States" and noting that "though an assignment may not comply with the terms of this section, the assignment may, nevertheless, be enforceable between the parties to the assignment.") (internal citation and quotations omitted); *In re Metric Metals Int'l, Inc.*, No. 80 CV 5414 (HFW), 1981 U.S. Dist. LEXIS 10124, at * 8 (S.D.N.Y. Nov. 9, 1981) (holding that the Assignment of Claims Act "would not invalidate the assignment in question as between the parties to the assignment, even though it may not have been valid as against the United States");

*King v. Gilbert*, 569 F.2d 398, 398 (5th Cir. 1978) (holding that the assertion of an assignment as being invalid was erroneous because the Assignment of Claims Act "was enacted to protect the federal government from conflicting claims and that between the [private] parties effect might still be given to an assignment that failed to comply with the statute") (*citing Segal v. Rochelle*, 382 U.S. 375, 384 (1966)).[9]

Whether or not the Anti-Assignment Act prevents PSEG from asserting takings claims against the government, the law is clear that the rights of private parties are unaffected by the Anti-Assignment Act. The Panel's conclusion that Plaintiffs assigned their claims to PSEG is sound both in law and reason, as are the other decisions challenged by Plaintiffs.

## III. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Vacate.

Dated: July 19, 2007

Respectfully submitted,

_ s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for
PSEG Nuclear, L.L.C. and
Public Service Electric and Gas Company

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

[9] Plaintiffs' argument that there is something unique about a takings claim is unsupported. Plaintiffs' cited cases say nothing about the enforcement of assignments between private parties for such claims and do nothing to negate the substantial authority to the contrary. *See* (Motion to Vacate at 3 n. 2.)



400601383v1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04–0034C, into which has |
| v. | ) | been consolidated No. 04-0036C |
| | ) | (Judge Christine Miller) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE ARBITRATION RULING

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER
Assistant Director

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
SCOTT R. DAMELIN
STEPHEN FINN
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7583
Fax: (202) 307-2503

July 19, 2007

Attorneys for Defendant

## TABLE OF CONTENTS


DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. THIS COURT DOES NOT POSSESS JURISDICTION TO VACATE AN ARBITRATION DECISION BETWEEN TWO PRIVATE PARTIES . . . . . . . . 1

A. The Court of Federal Claims Does Not Possess Jurisdiction To Adjudicate Disputes Between Private Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Other Judicial Fora Potentially Are Appropriate For Consideration Of The Arbitration Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C. Plaintiffs’ Motion To Vacate Simply Highlights The Fact That Plaintiffs Lack Any Basis To Allege A Takings Claim . . . . . . . . . . . . . . . . . . . . . . 6

1. Plaintiffs May Not Challenge Their Assignment Of Their Claims To PSEG On The Basis That It Violates The Assignment Of Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2. Plaintiffs May Not Allege A Takings Claim Under These Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. PLAINTIFFS’ CASE SHOULD BE STAYED PENDING THE FINAL RESOLUTION OF THEIR CLAIMS REGARDING SALEM AND HOPE CREEK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## CASES

AGCO Corp. v. Anglin,
216 F.3d 589 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Adams v. United States,
391 F.3d 1212 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Allegra Villa v. United States,
60 Fed. Cl. 11 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cermak v. Babbitt,
234 F.3d 1356 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Coast Indian Cmty. v. United States,
213 Ct. Cl. 129, 550 F.2d 639 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Danning v. Mintz,
367 F.2d 304 (9th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Ehleiter v. Grapetree Shores, Inc.,
482 F.3d 207 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fern v. United States,
908 F.2d 955 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ficek v. Southern Pacific Co.,
338 F.2d 655 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fisherman's Harvest, Inc. v. PBS&J,
No. 2006-1208, 2007 WL 1774922 (Fed. Cir. Jun. 21, 2007) . . . . . . . . . . . . . . . . . 2, 3, 4

In re Ideal Mercantile Corp.,
244 F.2d 828 (2d Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Kaufman,
37 P.3d 845 (Okla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Klamath Irrigation District v. United States,
67 Fed. Cl. 504 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lane v. Pena,
518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Maffia v. United States,
143 Ct. Cl. 198, 163 F. Supp. 859 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Martin v. National Surety Co.,
300 U.S. 588 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

McKenzie v. Irving Trust Co.,
323 U.S. 365 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Members of the Peanut Quota Holders Association, Inc. v. United States,
421 F.3d 1323 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

National City Bank of Evansville v. United States,
143 Ct. Cl. 163 F. Supp. 846 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,
458 U.S. 50 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Pacific Gas & Electric Co. v. United States,
70 Fed. Cl. 766 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Pittman v. Chicago Bd. of Education,
64 F.3d 1098 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Prudential Ins. Co. of Am. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

RHI Holdings, Inc. v. United States,
142 F.3d 1459 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Riviera Fin. of Texas, Inc. v. United States,
58 Fed. Cl. 528 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Stearns Co. v. United States,
396 F.3d 1354 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Sullivan v. United States,
46 Fed. Cl. 480 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Texas State Bank v. United States,
423 F.3d 1370 (Fed. Cir. 2005), reh'g denied (Dec. 13, 2005) . . . . . . . . . . . . . . . . . . . . 13

Tuftco Corp. v. United States,
222 Ct. Cl. 277, 614 F.2d 740 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United Pacific Ins. Co. v. United States,
175 Ct. Cl. 358 F.2d 966 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Shannon,
342 U.S. 288 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Vermont Yankee Nuclear Power Corp. v. United States,
73 Fed. Cl. 236 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTES


31 U.S.C. § 3727(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7


## MISCELLANEOUS


6 Am. Jur. 2d Assignments § 155, at 245 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## INDEX TO APPENDIX

Amended Arbitration Demand of Atlantic City Electric Company And Delmarva Power And Light Company, dated 4/23/07 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attachment 1

Memorandum of Law In Support Order To Show Cause, filed by PSEG Power, LLC and PSEG Nuclear, LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attachment 2

Order to Show Cause, filed by Honorable Neil H. Shuster, Superior Court of New Jersey, Chancery Division–Mercer County, dated 7/2/07 . . . . . . . . . . . . . . . . . . . . . . . . . . . Attachment 3

Joint Stipulations, dated 6/4/07, filed in Boston Edison Company v. United States, No. 99-447C (Fed. Cl.) & Entergy Nuclear Generation Co. v. United States, No. 03-2626C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attachment 4

Letter to A. Lo Re from R. Conway, dated 2/15/07, in Boston Edison Company v. United States, No. 99-447C (Fed. Cl.) & Entergy Nuclear Generation Co. v. United States, No. 03-2626C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attachment 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04–0034C, into which has been consolidated No. 04-0036C (Judge Christine Miller) |

DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION TO VACATE ARBITRATION RULING

Defendant, the United States, respectfully submits this response to "Plaintiffs' Motion To Vacate Arbitration Ruling,' dated July 2, 2007. In addition, we respectfully request clarification regarding one aspect of the Court's April 12, 2007 order.

## DISCUSSION

### I. THIS COURT DOES NOT POSSESS JURISDICTION TO VACATE AN ARBITRATION DECISION BETWEEN TWO PRIVATE PARTIES

#### A. The Court of Federal Claims Does Not Possess Jurisdiction To Adjudicate Disputes Between Private Parties

In their motion, plaintiffs, Delmarva Power & Light Company and Atlantic City Electric Company (collectively, "plaintiffs"), request that this Court vacate the arbitration decision between plaintiffs and PSEG Power LLC and PSEG Nuclear LLC (collectively, "PSEG"). Pl. Mot. 7.[1] The inherent, and unstated, assumption in plaintiffs' motion is that this Court possesses jurisdiction to vacate a private arbitration decision between private parties. Plaintiffs' assumption is incorrect.

---

[1] "Pl. Mot. ___" refers to the plaintiffs' motion to vacate, dated July 2, 2007.

"The jurisdiction of the Court of Federal Claims is prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir. 1998). Further, consent to be sued "will be strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. 187, 192 (1996). Pursuant to Section 1491(a) of Title 28, the Court of Federal Claims possesses jurisdiction to consider claims for money damages "founded either on the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or impled contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Plaintiffs carry the burden of establishing the existence of jurisdiction. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Plaintiffs cannot meet this burden.

As the United States Supreme Court has made clear, this Court does not possess jurisdiction to adjudicate disputes between private parties. See United States v. Sherwood, 312 U.S. 584, 588-89 (1941) ("We think it plain that the present suit could not have been maintained in the Court of Claims because the court is without jurisdiction of any suit brought against private parties . . ."); see also National City Bank of Evansville v. United States, 143 Ct. Cl. 154, 163 F. Supp. 846, 852 (1958) ("It is well established that the jurisdiction of this court extends only to claims against the United States, and obviously a controversy between private parties could not be entertained"). As the United States Court of Appeals for the Federal Circuit recently noted, "the Court of Federal Claims is a legislative court limited to resolving claims involving public rights, not private rights." Fisherman's Harvest, Inc. v. PBS&J, No. 2006-1208, 2007 WL 1774922, at *3 (Fed. Cir. Jun. 21, 2007) (emphasis added); see Northern

Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 67 (1982) (court's jurisdiction is limited to resolving claims involving public rights).[2]

In Fisherman's Harvest, oyster growers sued private contractors in Federal district court for the negligent design and implementation of a dredging project. Id. at *1. Subsequently, one of the private contractors filed a third-party complaint against the Army Corps of Engineers, alleging a contractual right to contribution and indemnity. Id. The Army Corps of Engineers moved to dismiss the contractor's third-party complaint for lack of jurisdiction, asserting that the Court of Federal Claims possessed exclusive jurisdiction to adjudicate the contractor's claims for contribution and indemnification. Id. In response to the Army Corps of Engineers' motion, the private contractor moved to transfer the entire case, including the oyster growers' claims against the private contractor, to this Court. Id. The district court granted the contractor's motion and concluded that this Court had exclusive jurisdiction to adjudicate the third-party complaint against the Army Corps of Engineers, and that there was no prohibition against transferring the oyster growers' claims against the private contractor to the Court of Federal Claims. Id.

On appeal, the oyster growers challenged the district court's transfer of their negligence claims against private contractors to this Court. Id. at *2. The Federal Circuit reversed the district court's order transferring the oyster growers' negligence claims and concluded that there was no "want of jurisdiction" that would deprive the district court of jurisdiction to adjudicate the oyster growers' claims. Id. at *3. The Federal Circuit concluded that, although the district

---

[2] Indeed, the Court's rules explicitly provide that the defendant in this Court, except in vaccine cases, is the United States. RCFC 10(a), see Rules Committee Note to RCFC 4; see also United States v. Sherwood, 312 U.S. 584, 588 (1941) (only United States can serve as party defendant in this Court).

court properly transferred the Tucker Act claim against the Army Corps of Engineers to this Court, the oyster growers' claims were private claims that fell outside of this Court's jurisdiction:

> Here, however, the oyster growers' claims are private claims – not claims against the government – and the diversity and amount in controversy requirements of 28 U.S.C. § 1332 have been met. Therefore, the reasoning that supports exclusive jurisdiction for Tucker Act claims over $10,000 against the government does not apply to claims brought solely between diverse private parties for damages to oyster beds.

Id. at *4.

The arbitration proceeding between plaintiffs and PSEG does not involve a waiver of sovereign immunity and is not the type of claim that could be addressed by Congress. Thus, the Court of Federal Claims cannot entertain claims concerning the private arbitration between plaintiffs and PSEG, because this claim falls outside of this Court's jurisdiction under the Tucker Act.[3]

---

[3] Even assuming, arguendo, that this Court somehow possesses jurisdiction to vacate a private arbitration decision between private parties, the Court should conclude that plaintiffs have waived their challenge to the arbitration panel's consideration of PSEG's alleged waiver by voluntarily submitting the issue for the arbitrator's consideration. After PSEG filed its demand for arbitration, plaintiffs filed an arbitration demand seeking, among other things, for the arbitrators to determine whether PSEG had waived its right to arbitration based upon its previous litigation conduct in the Court of Federal Claims. See Att. 1 (plaintiffs amended arbitration demand). Pursuant to plaintiffs' request, the arbitration panel did address, and ultimately rejected, plaintiffs' claim that PSEG waived its right to arbitration. See Arbitration Decision, at 13-17. Only now, after they have been confronted with an adverse arbitration decision, do plaintiffs contend that the arbitration panel lacked the authority to determine whether PSEG waived its right to arbitration. Such conduct should not be allowed by this Court. By affirmatively placing this issue before the arbitrators, plaintiffs have waived any claim that the arbitrators lacked the ability to consider this issue. See AGCO Corp. v. Anglin, 216 F.3d 589, 593 (7th Cir. 2000) ("If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the mater"); Ficek v. Southern Pacific Co., 338 F.2d 655, 657 (9th Cir. 1964)

B. Other Judicial Fora Potentially Are Appropriate For Consideration Of The Arbitration Decision

In their motion, plaintiffs rely exclusively upon the United States Court of Appeals for the Third Circuit's decision in Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007), for the proposition that this Court, rather than the arbitration panel, presumptively is the appropriate forum for resolving the issue of PSEG's alleged waiver by litigation conduct. Pl. Mot. 7-10. Regardless of the Third Circuit's decision regarding the division of presumptive jurisdiction between Article III courts and arbitration panels, that decision did not address whether the Court of Federal Claims possesses jurisdiction to adjudicate issues associated with the waiver of an arbitration claim between two private parties. Indeed, as we explained above, this Court does not possess such jurisdiction.

However, the fact that this Court does not possess jurisdiction to vacate the arbitration decision does not mean that plaintiffs lack any forum in which to resolve their dispute. Indeed, PSEG has sought to have the arbitration award confirmed in New Jersey state court. See Att. 2. After PSEG filed its complaint for summary affirmance, the state court issued an order to show cause, providing plaintiffs an opportunity to challenge the entry of an order confirming the

("[a] claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act.") (citing Wooley v. Eastern Air Lines, Inc., 250 F.2d 86, 91 (5th Cir. 1957)).

Here, plaintiffs voluntarily and affirmatively placed at issue before the arbitration panel their claim that PSEG waived its right to arbitration by its litigation conduct in the Court of Federal Claims. Now that they have received an adverse decision from the arbitration panel, they cannot now argue that the arbitrators did not posses the authority to resolve this issue. Consequently, to the extent that the Court concludes that it possesses jurisdiction to vacate the arbitration decision, it should conclude that plaintiffs' have waived their ability to challenge the arbitration decision by affirmatively placing this claim at issue in the arbitration.

arbitration decision. See Att. 3.[4] Allowing the New Jersey state court to resolve issues associated with the arbitration between plaintiffs and PSEG is consistent both with this Court's limited jurisdiction and the Third Circuit's decision in Ehleiter.

C. Plaintiffs' Motion To Vacate Simply Highlights The Fact That Plaintiffs Lack Any Basis To Allege A Takings Claim

1. Plaintiffs May Not Challenge Their Assignment Of Their Claims To PSEG On The Basis That It Violates The Assignment Of Claims Act

In its motion, apparently relying upon the Assignment of Claims Act, 31 U.S.C. § 3727, plaintiffs assert that they somehow retained the right to bring a takings claim because "any contractual agreement which would transfer entitlement to bring a takings claim to a subsequent property owner – or eliminate the entitlement of the property owner suffering the taking – would be null and void." Pl. Mot. 3 n.3. Plaintiffs have misconstrued the Assignment of Claims Act.

The Assignment of Claims Act protects the Government against assignments in certain instances:

> An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

[4] PSEG filed its request with the New Jersey state court on June 22, 2007, 10 days before plaintiffs filed their motion to vacate in this Court. Plaintiffs' motion did not indicate that PSEG had filed such a motion in New Jersey state court.

31 U.S.C. § 3727(b) (emphasis added). Consequently, if the Government does not "allow" the assignment claim, no claim may be assigned – whether it be a takings claim, a contract claim, or any other type of claim. Conversely, if the Government "allows" the assignment claim, any type of claim may be assigned. Contrary to plaintiffs' suggestion, the Assignment of Claims Act makes no distinction between takings claims, on the one hand, and other types of claims, on the other.[5]

Any doubt that the intended beneficiary of the Assignment of Claims Act is the Government, and not private litigants, is dispelled by reference to the underlying purpose of the statute. As the United States Supreme Court has recognized, the three primary purposes of the statute are: (1) "to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government;" (2) "to prevent possible multiple payments of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant;" and (3) "to save to the United States 'defenses which it has to claims by an assignor by way of set-off, counter claim, etc., which might not be applicable to an assignee.'" United States v. Shannon, 342 U.S. 288, 291-92 (1955). Indeed, it is beyond peradventure that the Assignment of Claims Act was enacted for the protection of the Government, see In re Ideal Mercantile Corp., 244 F.2d 828, 832 (2d Cir. 1957), and that only the Government may assert its protections. See Martin v.

---

[5] In United States v. Dow, 357 U.S. 17 (1958), the Supreme Court tied the prohibition against the assignment of takings claims to the Assignment of Claims Act. Id. at 20. That Act applies not only to takings claims, but also to contract claims. As discussed below, it is well established that the Government can waive that prohibition and accept a contract claim assignment. Tuftco Corp v. United States, 222 Ct. Cl. 277, 614 F.2d 740, 745 (1980). Plaintiffs have identified no reason that the same rule regarding waiver of the Assignment of Claims Act as they apply to contract claims is somehow different as they apply to takings claims.

National Surety Co., 300 U.S. 588, 594-95 (1937); McKenzie v. Irving Trust Co., 323 U.S. 365 (1945).

Further, although the Assignment of Claims Act works exclusively for the Government's protection, it is well-established that the Government may waive those protections or otherwise recognize an assignment. See Vermont Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 241 (2006) ("an assignment of claims is permissible where the assignment occurs by operation of law, or where the government chooses to 'recognize' the assignment of a claim"); Riviera Fin. of Texas, Inc. v. United States, 58 Fed. Cl. 528, 530 (2003) ("It is well established in the case law of this circuit that the Government can waive coverage of the Anti-Assignment Acts, as the Government concedes in this case"); Maffia v. United States, 143 Ct. Cl. 198, 163 F. Supp. 859, 862 (1958) ("the Government, if it chooses to do so, may recognize an assignment") (cited in Riviera Fin,, 58 Fed. Cl. at 530). Plaintiffs' implicit contention that the Government may recognize the assignment of contract claims, but not takings claims, is unsupported by the law.

Indeed, it is for this reason that courts have held that, even where an assignment does not comply with the Assignment of Claims Act, that assignment may still be enforceable between parties to the assignment. See Danning v. Mintz, 367 F.2d 304, 306 (9th Cir. 1966) (rejecting claim that assignment was null and void as between assignor and assignee because Assignment of Claims Act does not apply vis-a-vis private parties); United Pacific Ins. Co. v. United States, 175 Ct. Cl. 118, 358 F.2d 966, 969 (1966) ("There is no need to discuss whether the assignment in question complies with all the provisions of the Assignment of Claims Act, for whether or not

the transaction is valid as against the United States, it is in any event effective and binding on the parties").

Further, "[a]s against the assignee, an assignor is not permitted to raise the question of nonassignability." 6 Am. Jur. 2d Assignments § 155, at 245 (1999); see In re Kaufman, 37 P.3d 845, 855 (Okla. 2001) ("[t]he rule that an assignor cannot as against his assignee allege nonassignability is well settled"); see also Sullivan v. United States, 46 Fed. Cl. 480, 488 (2000) ("doctrine of equitable estoppel is a remedy by which a party may be precluded, by a party's own act or omission, from asserting a right to which it otherwise would have been entitled"). Consequently, plaintiffs have no basis for contending that their voluntary assignment of all of their claims to PSEG is somehow invalid under the Assignment of Claims Act.

2. Plaintiffs May Not Allege A Takings Claim Under These Circumstances

Regardless of plaintiffs' inability to challenge its assignment of all of its claims to PSEG, the underlying nature of plaintiffs' alleged "taking" – that is, that it received diminished value for the sale of its minority ownership interests as a result of DOE's delay in SNF acceptance – simply reflects the fact that plaintiffs' claim is one arising under the Standard Contract rather than the Constitution.

In the Court's July 1, 2005 unpublished decision denying the Government's motion for summary judgment, the Court adopted the rationale utilized in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005). In Boston Edison, the Court held that "Boston Edison may bring contract and takings claims concurrently, but, if both claims remain viable, recovery under the contract damages theory is appropriate." Boston Edison, 66 Fed. Cl. at 187-88 (citing Cienega Gardens v. United States, 331 F.3d 1319, 1334 (Fed. Cir. 2003), & Prudential Ins. Co. of Am. v.

United States, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986)). The Court stated that "[b]oth claims are currently viable, but a more complete record is necessary to determine if either theory would allow recovery." Boston Edison, 66 Fed. Cl. at 188. With all due respect, this conclusion contradicts the Federal Circuit's decisions regarding takings claims and breach of contract and, further, is in conflict with a recent decision by this Court.[6]

In concluding that takings and contract claims may be brought simultaneously, the Court in Boston Edison relied primarily upon the Federal Circuit's decisions in Cienega Gardens and Prudential. However, neither of these decisions support the conclusion that takings claims may be brought as alternatives to contract claims. The Federal Circuit's decision in Cienega Gardens has no relevance to the resolution of Boston Edison's takings claim. Indeed, if anything, Cienega Gardens supports the proposition that, where the Government enters into a contract with a plaintiff and breaches that contract, plaintiff's remedies lay in breach of contract rather than the Takings Clause of the Fifth Amendment. Cienega Gardens involved the implementation of regulations that interfered with the plaintiffs' investment-backed expectations in contracts that it had with third parties. Because the Government was not a party to the contracts, no contract remedy existed and, thus, the court found a regulatory taking had occurred. Id. at 1325; see Allegra Villa v. United States, 60 Fed. Cl. 11, 19 (2004) (explaining rationale of taking in Cienega). Conversely, because the plaintiff in Allegre Villa had a contract with the

[6] Notably, the plaintiff in Boston Edison voluntarily dismissed, with prejudice, its takings claim prior to trial. Att. 5. Specifically, when the Government served a Rule 30(b)(6) notice of deposition upon Boston Edison regarding the nature of its claimed property interest, Boston Edison indicated that it would withdraw its takings claim rather than produce a witness for the deposition. Att. 6.

Government and was in privity of contract with the Government, this Court required it to pursue the breach of contract claim and dismissed its takings claims:

> Because their contracts were with private lenders, plaintiffs in Cienega Gardens and Chancellor Manor were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. The present action, in contrast, involves plaintiffs that entered into contracts directly with the Government, and such contracts provide a remedy for the later prepayment restrictions.

Allegre Villa, 60 Fed. Cl. at 19. Consequently, there was no issue concerning alternative claims in Cienega because the plaintiff in that case did not have a contract claim against the Government.

Further, the basis for the notion that breach of contract and takings claims may be brought in the alternative is based upon a misapplication of the Federal Circuit's decision in Prudential Insurance Co. of America v. United States, 801 F.2d 1295 (Fed. Cir. 1986). In Prudential, the issue before the Court was whether foreseeability of damages for breach of a lease agreement should be measured as of the date of contract execution or the date that the lease was breached. Id. at 1300. Concluding that foreseeability of damages for breach of a lease agreement should be measured as of the date of contract execution, the Court noted in dicta that, "[a]lthough this may place a more difficult burden on a lessor seeking consequential damages against the government as a holdover tenant, lessors may have an alternative avenue of relief under the Takings Clause of the Fifth Amendment." Id. at 1300 n.13. Indeed, the plaintiff in Prudential had not brought a takings claim based upon the Government's hold-over of the lease.

Any doubt as to the viability of the Federal Circuit's dicta in Prudential has been laid to rest in its more recent decision in Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002), a

decision that the Court did not address in its decision denying the Government's motion for summary judgment. In Castle, the Federal Circuit expressly rejected the notion that a takings claim may be brought as an alternative to a breach of contract claim, holding that, where a plaintiff retains its contractual remedies, it may not maintain a takings claim based upon a breach of a Government contract. Id. at 1341-42. In this case, where there is no allegation that the Government has taken plaintiffs' contract remedies, plaintiffs may not, as a matter of law, maintain a takings claim – whether as an alternative to its breach claim or otherwise.

Further, in a decision issued one month after the Court's decision in this case, the Court in Klamath Irrigation District v. United States, 67 Fed. Cl. 504 (2005), rejected the notion of "alternative" breach of contract and takings claims, explaining that it was inconsistent with the nature of rights created by a contract with the Government:

> To be sure, some cases suggest that, under this rule, a takings claim is resurrected if a breach of contract is not found, see Systems Fuels, Inc. v. United States, 65 Fed. Cl. 163, 172-73 (2005). But such suggestions reflect a misunderstanding of the rationale for this rule. At least as described in Winstar and Castle, the rule favoring contract remedies depends upon there being symmetry between the contract rights to be enforced and the contract damages that are potentially available. Once this symmetry is established, a finding on the merits that no breach occurred does not break that relationship, but merely reflects that the contract rights that were asserted either never existed or were not adversely affected by the government's actions. Under either scenario, those same contract rights cannot provide the predicate for a takings because the government cannot take what the claimant does not have.

Id. at 432 n.31 (citations omitted).

In this case, there can be no "alternative" takings claim as a matter of fact or law. As the Court explained in Klamath, to the extent that the Court determines that plaintiffs' contract

claims are not viable because they assigned them to PSEG, that does not lead to the conclusion that plaintiffs may assert a takings claim. Rather, that simply means that plaintiffs did not have the rights that they claimed or that such rights had not been adversely affect by the Government.[7]

Further, in denying the Government's motion for summary judgment in Boston Edison, the Court held that a genuine issue of material fact existed because "the origin of plaintiff's rights is in dispute." Boston Edison, 64 Fed. Cl. at 187. However, the nature of a plaintiff's property interest is a question of law rather than a question of fact, and the Federal Circuit has recently explained that a plaintiff does not possess a protected property interest in statutes for purposes of compensation under the Takings Clause of the Fifth Amendment.

One month after this Court's decision denying the Government's motion, the Federal Circuit issued its decision in Texas State Bank v. United States, 423 F.3d 1370 (Fed. Cir. 2005), and reaffirmed the proposition that the determination of the nature of a property interest is a question of law rather than a question of fact. Id. at 1379 (citing Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980); Cermak v. Babbitt, 234 F.3d 1356, 1361 (Fed. Cir. 2000); Coast Indian Cmty. v. United States, 213 Ct. Cl.129, 550 F.2d 639, 649 (1977)).

Indeed, such a rule makes perfect sense. Under the Court's current holding in this case, the Government would be forced to engage in timely and expensive discovery over the nature of

[7] Because the Government has not physically occupied plaintiffs' property or required plaintiffs to submit to physical occupation of their land, plaintiffs cannot assert a physical takings claim as a matter of law. Stearns Co. v. United States, 396 F.3d 1354, 1357 (2005). At most, plaintiffs' claim is that plaintiffs were forced to store plaintiffs' SNF longer than they otherwise would have because of the Government's delay in performance under the Standard Contract. To the extent that plaintiffs have a claim, it lies in contract rather than the Constitution.

plaintiffs' alleged property interest. Indeed, the Government would presumably have to ask plaintiffs' witnesses what the nature of plaintiffs' property interests are and whether plaintiffs have a protected property interest in the Nuclear Waste Policy Act ("NWPA"). We would fully expect that counsel for plaintiffs would object to such questions as calling for a legal conclusion. Consequently, in light of the Federal Circuit's decision in Texas State Bank, as well as its progeny, we respectfully request that the Court reconsider that aspect of its decision holding that the determination of a property interest is a matter of fact and, further, decide the nature of plaintiffs' property interest as a matter of law.

Further, in considering the nature of plaintiffs' property interest, the Court should also consider that the Federal Circuit recently has rejected the notion that statutes like the NWPA may form the basis of a protected property interest that is compensable under the Fifth Amendment. In Members of the Peanut Quota Holders Association, Inc. v. United States, 421 F.3d 1323 (Fed. Cir. 2005), the Federal Circuit held that the Government was not responsible for paying the holders of peanut quotas just compensation when the Government made the quotas less valuable. Id. at 1334. The Federal Circuit explained that the plaintiffs were not entitled to compensation

> because the property interest represented by the peanut quota is entirely the product of a government program unilaterally extending benefits to the quota holders, and nothing in the terms of the statute indicated that the benefits could not be altered or extinguished at the government's election.

Id. The Federal Circuit further explained that, although the quotas were a form of property, they were subject to alteration or elimination by changes in the Federal program and that such changes did not give rise to a takings claim. Id. As in Peanut Quota, plaintiffs may not assert a

protected property interest in the NWPA, as a matter of law, for purposes of compensation under the Fifth Amendment.[8]

In its order denying the Government's motion for summary judgment, the Court in Boston Edison concluded that a disputed genuine issue of material fact existed regarding whether Boston Edison voluntarily entered into the Standard Contract and the "reasonableness of the parties' expectations at issue under the legal framework for a regulatory takings claim." Boston Edison, 64 Fed. Cl. at 187. First, the reasonableness of the parties expectations is an element of the substantive regulatory takings analysis. However, before the Court can address this issue, it must first determine whether plaintiffs have plead a takings claim that is cognizable as a matter of law. If the Court concludes that plaintiffs may not base its takings claim upon a breach of the Standard Contract, as a matter of law, then the issue of the reasonableness of the parties' expectations becomes irrelevant.

Second, the Government is unclear as to the relevance of the voluntariness of entering into the Standard Contract. Regardless of whether plaintiffs voluntarily entered into the

---

[8] Peanut Quota is entirely consistent with other decisions from the Federal Circuit and other courts of appeals that have held that statutes may not confer upon a plaintiff a protected property interest compensable under the Fifth Amendment. See Adams v. United States, 391 F.3d 1212, 1220 (Fed. Cir. 2004) (holding that statutory right to be paid money could not constitute a protected property interest for purposes of the takings clause); Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) ("[T]he law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations."); Branch v. United States, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995) ("If every time a man relied on the existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever") (quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Education, 64 F.3d 1098, 1104-05 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred.")

Standard Contract, plaintiffs had, at one point, a contractual right to the Government's removal of SNF, and the Government has not taken plaintiffs' contractual remedies. Even if the Court concluded that entering into the Standard Contract was not voluntary, that does not somehow convert plaintiffs' breach of contract claim into a viable takings claim. Consequently, to the extent that the Court concludes that plaintiffs' right to have its SNF accepted by the Government derives solely from the Standard Contract and that the Government did not take plaintiffs' contractual remedies, issues concerning the voluntariness of entering into the contract or the reasonableness of the parties' expectations should not preclude the Court from dismissing plaintiffs' takings claim.[9]

---

[9] In this Court's decision, it noted that "Plaintiffs articulate three distinct property interests which are cognizable for purposes of a takings claim: (1) the real property interests in the property used for storage of the SNF necessitated by the government's actions; (2) the property interests in the assets associated with the nuclear stations; and (3) the ability to enjoy the use and benefit of the nuclear stations." Op. at 5. In Pacific Gas & Electric Co. v. United States, 70 Fed. Cl. 766 (2006), this Court recently rejected a takings claim raised by another SNF plaintiff alleging substantially similar property interests. Id. at 778-80. Specifically, the Court in PG&E, referring to its prior decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003), explained as follows:

> Plaintiff alone was responsible for the storage and disposal of its SNF and HLW prior to the Standard Contract. Therefore, absent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim . . . [P]laintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy.

Id. at 778.

The Court further rejected PG&E's claim that a taking had occurred because it had to continue storing SNF on its site and explained, "[t]he court finds that plaintiff's unilateral decision to build an ISFSI to continue to store this SNF cannot amount to the accrual of a taking of plaintiff's property by the government any more than can its storage activities to date. Indeed, the costs associated with the construction of such a facility, if they are found to be reasonably

## II. PLAINTIFFS' CASE SHOULD BE STAYED PENDING THE FINAL RESOLUTION OF THEIR CLAIMS REGARDING SALEM AND HOPE CREEK

In the status report filed on June 29, 2007, plaintiffs request an additional stay of the claims relating to the Hope Creek and Salem facilities for "a limited period" while they explore their options regarding the arbitration decision. Status Report, at 1-2. However, plaintiffs also request that the Court lift the stay as it relates to plaintiffs' minority ownership interest in the Peach Bottom facility because the arbitration decision did not relate to that facility. Id. at 2.

Although we do not oppose an additional reasonable stay in these cases, any such stay should apply to all three nuclear generating facilities. In the Court's April 12, 2007 order, the Court granted, in part, the Government's motion to consolidate plaintiffs' case with the plaintiff in PSEG Nuclear L.L.C. v. United States, No. 01-551C (Fed. Cl.) (Futey, J.). To the extent that plaintiffs are ultimately successful in their challenge to the arbitration, allowing plaintiffs to pursue its claims related to Peach Bottom now, and then subsequently to litigate claims related to Hope Creek and Salem, would effectively renders moot this Court's order granting, in part, the Government's motion for consolidation. Further, plaintiffs sold their minority interest in Peach Bottom to both PSEG and PECO Energy Company ("PECO").[10] Consequently, under plaintiffs' proposal, discovery would be needed to be conducted twice for PSEG employees – once related

---

foreseeable by the government, caused by the government's breach, and proved to a reasonable certainty, may be fully vindicated through a breach of contract remedy." Id. at 779 (citation omitted). The Court's reasoning in PG&E should apply with equal force in this case.

[10] Pursuant to plaintiffs' amended complaints, ACE sold its 3.755 percent interest in Peach Bottom to PSEG, and another 3.755 percent interest to PECO. ACE Amended Compl. ¶ 2. Delmarva sold identical interests related to Peach Bottom to both PSEG and PECO. Delmarva Amended Compl. ¶ 2.

to Peach Bottom and a second time, if plaintiffs are successful in challenging the arbitration decision, related to Hope Creek and Salem. Plaintiffs' proposal is both inefficient and will waste significant resources. Further, we understand that the acquisition of Peach Bottom, Hope Creek, and Salem was part of a single transaction, and plaintiffs' suggestion that discovery in this case be somehow bifurcated between the different nuclear generation stations makes little sense. Accordingly, we respectfully request that, to the extent that the Court continues the stay in this case, the Court continue the stay in this case related to all three nuclear generation stations until such time as plaintiffs decide whether to challenge the arbitration decision related to its assignment of all claims to PSEG.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny plaintiffs' motion to vacate the arbitration ruling.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
SCOTT R. DAMELIN
STEPHEN FINN
Trial Attorneys

July 19, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of July 2007, a copy of foregoing “DEFENDANT'S RESPONSE TO PLAINTIFFS’ MOTION TO VACATE ARBITRATION RULING” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Joshua E. Gardner